615 A.2d 321

COMMONWEALTH of Pennsylvania, Appellee,

v.

Jay C. SMITH, Appellant.

Supreme Court of Pennsylvania.

Argued May 6, 1992.

Decided Sept. 18, 1992.

178

---

William C. Costopoulos, Lemoyne, for appellant.

Robert A. Graci, Chief Deputy Atty. Gen. and Anthony Sarcione, Executive Deputy Atty. Gen., for appellee.

Before NIX, C.J., and LARSEN, FLAHERTY, McDERMOTT, ZAPPALA, PAPADAKOS and CAPPY, JJ.

## OPINION OF THE COURT

FLAHERTY, Justice.

In this infamous murder case, we are compelled to order the discharge of appellant Jay C. Smith. Despite our prior holding granting a retrial, *Commonwealth v. Smith*, 523 Pa. 577, 568 A.2d 600 (1989), we now hold that the prosecutorial misconduct during appellant's first trial was not only impermissible, but had constitutional implications under the double jeopardy clause which prohibit retrial.

At issue is whether the double jeopardy clause bars retrial following intentional prosecutorial misconduct designed to secure a conviction through the concealment of exculpatory evidence; previously, we have held that "double jeopardy will attach only to those mistrials which have been intentionally caused by prosecutorial misconduct." *Commonwealth v. Simons*, 514 Pa. 10, 16, 522 A.2d 537, 540 (1987), adopting the federal constitutional standard set forth in *Oregon v. Kennedy*, 456 U.S. 667, 102 S.Ct. 2083, 72 L.Ed.2d 416 (1982). The Superior Court recognized that our prior remand did not foreclose this question, and it considered the issue and the claim of double jeopardy to be outside the scope of the direct appeal. *Commonwealth v. Smith*, 404 Pa.Super. 553, 557, 591 A.2d 730, 732 (1991). Superior Court's view is supported by the fact that the after-discovered evidence of prosecutorial misconduct during appellant's trial was unknown to appellant during his direct appeal and was not presented to this court at that time. Both the trial court and the Superior Court, *Commonwealth v. Smith, supra* at 559, 591 A.2d at 733, in proceedings following remand, found that intentional prosecutorial misconduct had been proved by appellant but deferred the remedy, a question of first impression, to this court. We granted allocatur to consider this question.

Inasmuch as a more detailed description of the crimes charged against appellant is contained in our prior opinion,

*Smith, supra,* 523 Pa. 577, 568 A.2d 600, we abridge our description of the case for purposes of this appeal. Schoolteacher Susan Reinert and her two young children were murdered in June, 1979. William Bradfield, who was her fiancé and fellow schoolteacher, and appellant, who was the principal of their school, allegedly had conspired to murder Mrs. Reinert in order to recover the proceeds of insurance policies on her life which named her fiancé as beneficiary. The Commonwealth presented physical evidence linking appellant to the murders as well as various other testimonial evidence which, together, this court regarded as sufficient to sustain appellant's conviction. *Id.* at 586, 568 A.2d at 605. Nevertheless, this court held that appellant was entitled to a new trial due to the admission of impermissible hearsay testimony by associates of alleged co-conspirator Bradfield. *Id.* at 588–96, 568 A.2d at 605–09.

Before appellant could be retried, he filed a motion to preclude a new trial based on double jeopardy because of after-discovered evidence of prosecutorial misconduct. He alleged that the Commonwealth withheld potentially exculpatory physical evidence during his first trial and that the Commonwealth knowingly denied the existence. of the agreement which existed with its chief witness whereby the witness received favorable sentencing treatment in exchange for his testimony against appellant. These alleged Commonwealth tactics were clearly in violation of the rule of *Brady v. Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963), and, if proved, would, at the very least, entitle appellant to a new trial pursuant to *Brady.* Under the holding of *Commonwealth v. Simons, supra,* however, appellant would not be entitled to discharge to avoid double jeopardy, for the violation was not based on a "claim that the prosecutor *intended to provoke a mistrial."* *Id.* 514 Pa. at 20, 522 A.2d at 542 (emphasis in original). Appellant presents the case hypothesized in *Simons,* "where the Commonwealth conceals its efforts to subvert the truth-determining process, ... [where there is] no intent to goad the defendant into moving for a mistrial. Quite the opposite, the intent would be that the

defendant should never know how his wrongful conviction came about." *Simons, supra* at 23, 522 A.2d at 544 (Flaherty, J., concurring).

After appellant's direct appeal from his first trial, he acquired evidence that the Commonwealth had obtained his conviction by overreaching in two respects. Specifically, he learned that the prosecution's chief witness, Mr. Martray, who denied the existence of any bargain in exchange for his testimony against appellant, was in fact awaiting sentencing for unrelated crimes and did in fact receive favorable treatment by the Commonwealth at his sentencing. Appellant was thereby precluded from impeaching Mr. Martray's veracity by exposing his motivation to testify falsely against appellant in order to minimize his own punishment. Secondly, appellant learned that the Commonwealth knowingly withheld physical evidence by hiding the fact that grains of sand were discovered between the toes of the murder victim at her autopsy, failing to present this evidence at appellant's trial and failing to apprise appellant of the evidence in compliance with *Brady, supra*. The significance of the sand lay in the fact that the scene of Susan Reinert's murder was unresolved; it was possible that the murder did not take place where the body was discovered but somewhere else and that the body was afterwards moved to the place of discovery. The prosecution theory was that the murder took place in Pennsylvania, whereas the defense theory was that the murder occurred in Cape May, New Jersey, where Bradfield had been and appellant had not. Thus the existence of the sand was potentially exculpatory to appellant, and the Commonwealth deliberately concealed the evidence for more than two years after the trial.

Due to the fact that appellant learned of these incidents of misconduct long after his trial, they were not part of the record at the time of his direct appeal. Upon remand to the trial court, appellant moved for discharge on the basis of the after-discovered evidence. Hearings were held, and the trial court found as fact that both incidents of misconduct were committed by the Commonwealth. The adhesive "lifters" used to remove and retain the sand from between the victim's

toes were discovered by the Commonwealth during appellant's trial but were not disclosed to appellant despite the prosecutor's awareness of their importance. This is established by a mid-trial memorandum from the assistant attorney general who prosecuted appellant to his superior, the executive deputy attorney general, stating: "It is obvious from [defense counsel's] tactics thus far that he will attempt to establish that Mrs. Reinert was killed at the shore in Cape May, New Jersey by William Bradfield, Chris Pappas, and Susan Myers. The sand, therefore, is extremely material to the defense case." Similarly, the Commonwealth deliberately denied the existence of the agreement pursuant to which its witness, Mr. Martray, received extremely lenient treatment at his sentencing in return for his testimony against appellant.

Such misconduct, standing alone, would suffice to implicate the protection of the double jeopardy clause. But further examination of the record establishes the bad faith of the prosecution beyond any possibility of doubt; indeed, it would be hard to imagine more egregious prosecutorial tactics.

One of the Commonwealth's witnesses was Corporal John Balshy, a former Pennsylvania state trooper who had investigated the Reinert murders and been present during the victim's autopsy. He testified on cross-examination that he had used adhesive lifters to remove granular particles which looked like sand from between the victim's toes. The Commonwealth excoriated Corporal Balshy, implying that he had fabricated his testimony about the adhesive lifters. The Commonwealth then presented the testimony of other state police officers who had attended the autopsy and did not remember the sand or the adhesive lifters, attempting to prove that Balshy's testimony was false. The prosecutor even recommended to the deputy executive attorney general that he investigate the feasibility of prosecuting Balshy for perjury. A few days later, *while appellant's trial was still in progress,* the Pennsylvania state police discovered the missing adhesive lifters in their evidence locker at the state police barracks. Despite their significant relation to the facts at issue in the trial, the Commonwealth suppressed the discovery. Then for

more than two years, while appellant's case was on direct appeal to this court, the Commonwealth continued to suppress the fact that it had in its possession the disputed exculpatory evidence, vigorously arguing all the while that this court should affirm appellant's death sentence.

Meanwhile, Corporal Balshy was made the scapegoat for the misconduct on the theory that he had fabricated and "planted" the evidence after the autopsy. It was even argued by the Commonwealth at appellant's trial that the defense had paid Balshy to concoct his testimony about the sand and the lifters. Investigations conducted after trial by the state police and by the attorney general's office concluded that there was no evidence of perjury or falsification of evidence by Balshy. Finally, on July 12, 1988, the attorney general's office informed defense counsel that the missing lifters had been discovered, though *even then,* there seemed to be some hesitancy concerning the prosecutor's duty to disclose the evidence.

It is a gross understatement to conclude, as stated by the trial court and Superior Court that "neither the Attorney General's Office nor the Pennsylvania State Police can take any great pride in the manner in which this case was handled during the trial and on appeal." *Commonwealth v. Smith,* 404 Pa.Super. at 560 n. 3, 591 A.2d at 733 n. 3. Deliberate failure to disclose material exculpatory physical evidence during a capital trial, intentional suppression of the evidence while arguing in favor of the death sentence on direct appeal, and the investigation of Corporal Balshy's role in the production of the evidence rather than its own role in the suppression of evidence constitute prosecutorial misconduct such as violates all principles of justice and fairness embodied in the Pennsylvania Constitution's double jeopardy clause.

Prior to the decision of the United States Supreme Court in *Oregon v. Kennedy, supra,* the intentional misconduct of the prosecutor at appellant's trial would unquestionably have resulted in the invocation of the double jeopardy bar against subsequent prosecution. The standard in effect prior to *Oregon v. Kennedy* was:

"The Double Jeopardy Clause does protect a defendant against governmental actions intended to provoke mistrial requests and thereby to subject defendants to the substantial burdens imposed by multiple prosecutions.

"[The Double Jeopardy Clause] bars retrials where 'bad faith conduct by judge or prosecutor,' threatens the '[h]arassment of an accused by successive prosecutions or declarations of a mistrial so as to afford the prosecution a more favorable opportunity to convict' the defendant." *United States v. Dinitz*, 424 U.S. [600], at 611, 47 L.Ed.2d 267, 96 S.Ct. 1075 [1081] (citations omitted).

*Id.*, 456 U.S. at 674, 102 S.Ct. at 2088, 72 L.Ed.2d at 423–24. The same standard was embodied in our caselaw:

The United States Supreme Court has enunciated principally two types of prosecutorial overreaching. First there is the prosecutorial misconduct which is designed to provoke a mistrial in order to secure a second, perhaps more favorable, opportunity to convict the defendant. Second there is the prosecutorial misconduct undertaken in bad faith to prejudice or harass the defendant. In contrast to prosecutorial error, overreaching is not an inevitable part of the trial process and cannot be condoned. It signals the breakdown of the integrity of the judicial proceeding, and represents the type of prosecutorial tactic which the double jeopardy clause was designed to protect against.

*Commonwealth v. Starks*, 490 Pa. 336, 341, 416 A.2d 498, 500 (1980) (citations omitted). *Oregon v. Kennedy,* however, under the guise of simplifying and clarifying the principle, restated the test as follows:

Because of the confusion which these varying statements of the standard in question have occasioned in other courts, we deem it best to acknowledge the confusion and its justifiability in the light of these statements from previous decisions. We do not by this opinion lay down a flat rule that where a defendant in a criminal trial successfully moves for a mistrial, he may not thereafter invoke the bar of double jeopardy against a second trial. But we do hold that the circumstances under which such a defendant may invoke

the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial.

456 U.S. at 679, 102 S.Ct. at 2091, 72 L.Ed.2d at 426–27. This court, recognizing that theretofore the standard under the double jeopardy clause of the Pennsylvania Constitution had been coextensive with the federal Constitution, restated the test in *Commonwealth v. Simons, supra*, in terms of the federal standard enunciated in *Oregon v. Kennedy*.

In neither *Oregon v. Kennedy* nor *Commonwealth v. Simons* did the reworded test produce a different result than would have been reached under the prior test. In *Oregon v. Kennedy*, the prosecutor asked a question in such form as to reflect adversely on the character of the defendant, but the inadvertent reference was not calculated to provoke a mistrial nor to prejudice the defendant; he would not have received double jeopardy protection under the prior test or under the restated test. In *Simons*, the defendant made a "doubtful" claim that the prosecutor failed to make full disclosure of a plea agreement with a Commonwealth witness, but the prosecutor's conduct clearly was not intended to provoke a mistrial nor to prejudice the defendant. The *Simons* court specifically stated that

> we are describing anew only the present applicable standard of review and the circumstances which will cause double jeopardy to attach but not changing the right itself. . . . Double jeopardy, nevertheless, continues to mean what it has always meant; no new rights were created by *Starks* nor are they being subtracted by virtue of this analysis.

*Commonwealth v. Simons*, 514 Pa. at 16, 522 A.2d at 541. Thus the restatement of the double jeopardy standard did not appear as a diminution of a defendant's constitutional rights, though it was predicted in *Simons* that cases might arise in which the new standard would afford less protection than the prior test. *See Id.* at 20–23, 522 A.2d at 542–44 (Flaherty, J., concurring).

Although it is arguable that the test enunciated by the United States Supreme Court in *Oregon v. Kennedy* would bar appellant's retrial on the theory that the prosecutor's conduct was intended to subvert the protections afforded by the double jeopardy clause, *see* 456 U.S. at 675–76, 102 S.Ct. at 2088–89, 72 L.Ed.2d at 424, it is possible that some courts would not view the prosecutorial misconduct in this case as rising to the level of subversion of constitutional rights. Regardless of what may be required under the federal standard, however, our view is that the prosecutorial misconduct in this case implicates the double jeopardy clause of the Pennsylvania Constitution.

We now hold that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial. Because the prosecutor's conduct in this case was intended to prejudice the defendant and thereby deny him a fair trial, appellant must be discharged on the grounds that his double jeopardy rights, as guaranteed by the Pennsylvania Constitution, would be violated by conducting a second trial.

Order reversed and appellant discharged.

LARSEN, J., did not participate in the consideration or disposition of this case.

McDERMOTT, J., did not participate in the disposition of this case.