**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| | : | |
| | : | |
| v. | : | |
| | : | |
| | : | |
| | : | |
| RASHAWN TAHI KNOX | : | |
| | : | |
| Appellant | : | No. 498 MDA 2018 |

Appeal from the Order Entered February 20, 2018
In the Court of Common Pleas of Dauphin County Criminal Division at
No(s):  CP-22-CR-0000772-2014

BEFORE:  BENDER, P.J.E., LAZARUS, J., and MURRAY, J.

MEMORANDUM BY LAZARUS, J.:                **FILED FEBRUARY 15, 2019**

Rashawn Tahi Knox appeals from the order, entered in the Court of Common Pleas of Dauphin County, denying his motion to dismiss on double jeopardy grounds.[1]  Upon careful review, we affirm.

---

[1] An order denying a motion to dismiss charges on double jeopardy grounds is technically interlocutory.  However, such an order is immediately appealable as a collateral order where the trial court does not make a finding that the motion was frivolous.  *See* Pa.R.Crim.P. 587(B)(6).  Here, the court did not find that Knox's motion was frivolous.  Thus, the order denying his motion is immediately appealable as a collateral order. Pa.R.A.P. 313.  *See* ***Commonwealth v. Orie***, 22 A.3d 1021 (Pa.2011) (reiterating that direct appeal from denial of motion to dismiss on double jeopardy grounds is not permitted where hearing court has considered the motion and made written findings that motion is frivolous; however, absent such finding, appeal may be taken from denial of motion).  ***See also Commonwealth v. Brady***, 508 A.2d 286, 289–91 (Pa. 1986) (allowing an immediate appeal from denial of double jeopardy claim under collateral order doctrine where trial court does not make a finding of frivolousness).

On March 11, 2015, a jury convicted Knox of one count of attempted homicide, two counts of aggravated assault and related weapons charges arising from the following factual scenario:

On September 13, 2013, Office [Donald] Bender [of the Harrisburg Bureau of Police] was on patrol duty in the city of Harrisburg. He was dispatched to the intersection of Crescent and Kittatinny Streets for multiple reports of multiple gunshots. He arrived at the scene about 4:45 p.m. and began to look for any active shooting. Finding none, and finding no immediate danger, he began to interview witnesses. He instructed other officers who arrived nearly simultaneously to secure the crime scene, which they did. Witnesses indicated that the victims had left in a van and the officers did not observe anyone who might be a suspect.

[Jerrell Thompson], a victim, testified [at trial]. [ ] Thompson is currently incarcerated in Cumberland County Prison for both a parole violation and a theft. About three years prior to the incident, [ ] Thompson began using heroin. By August or September of 2013, he was using it on a daily basis. He purchased it in Harrisburg from someone named "Tip", whom he identified as [Knox]. He would contact [Knox] by cell phone, both calls and texts. They would then meet up somewhere in Harrisburg, often in the Hall Manor area.

Two days prior [to the incident in question], [on] September 11, 2013, [ ] Thompson had arranged to meet [Knox] to buy heroin. They made the trade and as [ ] Thompson walked away, he saw a lot of policemen converge on the van that [Knox] was driving. He saw [Knox] jump out of the van and start running and then [ ] Thompson also ran. As far as [Thompson] could see, [Knox] was able to elude the police. [ ] Thompson denied having contacted police or having any connection to that raid. He agreed that it was suspicious that the police converged upon [Knox] just after their deal.

Usually [ ] Thompson would buy a bundle (about ten bags) for himself and other users. On [September 13, 2013], [ ] Thompson was planning on buying ten bundles for him and others. [Knox] instructed [ ] Thompson to meet him at the dead end of Crescent Street.

> Once [ ] Thompson and his compatriots arrived, they parked and waited for [Knox]. [Knox] arrived and [ ] Thompson got out of the van to walk with him. The two of them walked around a corner and [ ] Thompson saw another man standing there. [ ] Thompson and [Knox] were speaking about the incident on September 11 when the other man pulled out a gun as did [Knox]. Neither [Knox] nor the other man with a gun seemed surprised to see each other or that they both had guns. [ ] Thompson ran off towards the van[.] [H]e ran first to the passenger's side, but in an attempt to avoid getting shot in the back, he then ran to the driver's side. [Knox] ran to the front of the car and started shooting. The driver [Starr Shopp] was hit and then [ ] Thompson was shot in the back.
>
> . . . [Detective Richard] Iachini was dispatched to Harrisburg Hospital on September 13, 2013, related to a shooting. . . . Following [his] investigation, [Detective] Iachini developed a suspect and created a photo array. He met with [ ] Thompson on September 20, 2013, at the hospital and [ ] Thompson identified [Knox] from the photo array.

*Commonwealth v. Knox*, 142 A.3d 863, 864–65 (Pa. Super. 2016), quoting Trial Court Opinion, 9/29/15, at 1–3, 7–8 (footnotes, citations and some brackets omitted).

Following a two-day trial, Knox was convicted by a jury of the above charges. On May 12, 2015, the trial court sentenced him to an aggregate term of 20 to 40 years' incarceration. Knox appealed and, on June 21, 2016, this Court vacated his judgment of sentence and awarded him a new trial, concluding that the trial court committed reversible error when it failed to determine whether a certified interpreter was available to assist a Spanish-speaking witness and, instead, allowed the witness' sister – who was also a witness at trial – to translate for him.

On October 30, 2017, Knox filed a motion to dismiss the charges against him, arguing that his retrial was barred by prosecutorial misconduct that allegedly occurred during the course of his first trial. The trial court held a hearing on February 20, 2018, and denied the motion that same day. Knox filed a timely notice of appeal followed by a court-ordered statement of errors complained of on appeal pursuant to Pa.R.A.P. 1925(b).[2] On appeal, Knox raises the following issue for our review:

> Whether the trial court erred in denying Knox's motion for dismissal following a mistrial where the Commonwealth engaged in prosecutorial misconduct by having one prosecution witness interpret and assist in the testimony of another prosecution witness and by presenting facts not in evidence including reference to a gun that was excluded by the [c]ourt's pretrial rulings to the jury in closing?

Brief of Appellant, at 5.

We begin by noting that "[a]n appeal grounded in double jeopardy raises a question of constitutional law. This court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*[.]" ***Commonwealth v. Vargas***, 947 A.2d 777, 780 (Pa. Super. 2008) (internal

_____

[2] On November 20, 2018, we issued a judgment order dismissing Knox's appeal for failure to order the transcription of the notes of testimony from the February 20, 2018 hearing on his motion to dismiss. On December 4, 2018, Knox filed for reconsideration/reargument on the basis that the transcript had, in fact, been belatedly made part of the certified record on September 10, 2018. By order dated January 10, 2019, we granted reconsideration and remanded the record to the trial court for the preparation of an opinion pursuant to Pa.R.A.P. 1925(a). The trial court has complied and the matter is now ripe for disposition.

citations omitted). To the extent that the trial court's factual findings impact its double jeopardy ruling, we apply a more deferential standard of review to those findings:

> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

**Commonwealth v. Wood**, 803 A.2d 217, 220 (Pa. Super. 2002), quoting **Commonwealth v. Young**, 692 A.2d 1112, 1114–15 (Pa. Super. 1997).

The Double Jeopardy Clause of the Pennsylvania Constitution prohibits retrial of a defendant when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of denying him a fair trial. **Commonwealth v. Smith**, 615 A.2d 321 (Pa. 1992). However, because of the compelling societal interest in prosecuting criminal defendants to conclusion, our Supreme Court has recognized that dismissal of charges is an extreme sanction that should be imposed sparingly and only in cases of blatant prosecutorial misconduct. **Commonwealth v. Burke**, 781 A.2d 1136, 1144 (Pa. 2001). An error by a prosecutor does not deprive a defendant of a fair trial. **Commonwealth v. Kearns**, 70 A.3d 881, 884 (Pa. Super. 2013), quoting **Commonwealth v. Chmiel**, 777 A.2d 459, 464 (Pa. Super. 2001) (where prosecutor's conduct changes from mere error to intentionally subverting court process, then fair trial is denied). Even a mere finding of willful prosecutorial misconduct will not necessarily warrant dismissal of

charges. ***Burke***, 781 A.2d at 1145; ***Commonwealth v. Moose***, 602 A.2d 1265 (Pa. 1992) (although prosecutor's failure to inform defense counsel of witness statement containing incriminating admissions allegedly made by defendant amounted to willful discovery violation and raised significant ethical concerns, court did not dismiss charges, but rather remanded for new trial).

> [U]nder Pennsylvania jurisprudence, it is the intentionality behind the Commonwealth's subversion of the court process, not the prejudice caused to the defendant, that is inadequately remedied by appellate review or retrial. By and large, most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial. Intentional prosecutorial misconduct, on the other hand, raises systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial.

***Kearns***, 70 A.3d at 884–85.

Here, Knox bases his claim on two separate incidents that occurred during his first trial. The first involved the testimony of Commonwealth witness Dalvin Rosario, a native Spanish speaker. During his testimony, Rosario was asked to refresh his recollection by reading the statement he gave to police on the day of the incident. The following exchange then transpired:

> Q: Dalvin, just read from here to here by yourself. Okay? Just read that to yourself to see if it refreshes your recollection. Okay?
>
> A: I don't read English well.
>
> Q: Okay. Would—having [your sister] in here to help translate, would that help?
>
> A: Yeah.
>
> MR. JASON: Your Honor, would she be permitted —
>
> THE COURT: Yes.

N.T. Trial, 3/11/15, at 153. The court then swore in Rosario's sister as a translator and she proceeded to assist Rosario during his direct examination. Knox asserts that he was "denied a fair trial not only because of the lack of a certified interpreter in this case, but more significantly because Attorney Jason had one Commonwealth witness clandestinely assist another Commonwealth witness during [his] testimony." Brief of Appellant, at 16. Knox claims that "it was the conscious object of [Attorney] Jason[] to call Ms. Marte to assist Mr. Rosari[o] . . . so that he would testify consistent with what was in the police report." *Id.* at 16, 17.

The second alleged incident of prosecutorial misconduct occurred during Attorney Jason's closing argument. By way of background, prior to Knox's 2015 trial, the trial court issued an order granting a motion *in limine* filed by the Commonwealth, allowing evidence of prior drug dealing incidents involving Knox and the victims pursuant to Pa.R.E. 404(b)(2), as well as evidence of an event that occurred on September 11, 2013, two days prior to the incident forming the basis for the current prosecution, in which Knox had attempted to sell drugs to the victim, but fled the scene when police approached. During the September 11 incident, police raided and seized the vehicle in which Knox had been a passenger and recovered a gun. The Commonwealth sought to introduce evidence of the September 11 incident to establish an inference that Knox shot Thompson as a retaliatory measure because he believed Thompson

had set him up on September 11.[3] At trial, evidence of the September 11 incident was admitted through the testimony of one of the victims, Jerrell Thompson. Later during the course of the trial, the court sustained a defense objection to the introduction of further testimony regarding the September 11 incident by Detective Richard Iachini. The parties instead entered into a stipulation that was communicated to the jury as follows:

> Ladies and gentlemen, the stipulation between the parties is that during Detective Iachini's discussion with the defendant, he mentioned the September 11th incident that was testified [to] by victim Thompson, and that the defendant did acknowledge the sale on that September 11th day.

N.T. Trial, 3/11/15, at 266.

Subsequently, during closing remarks, the Commonwealth used a PowerPoint presentation that made two references to the gun discovered in Knox's van by police during the September 11 raid, in violation of the court's ruling earlier that day that further evidence concerning the September 11 raid was inadmissible. Defense counsel moved for a mistrial, which the court denied. Knox now asserts that Attorney Jason's inclusion in the PowerPoint presentation of references to the gun amounted to misconduct intended to mislead the jury.

---

[3] The Commonwealth argued that "the fact that [Knox] made a deal with the victim two days prior, that [Knox] was subsequently—or nearly arrested, he had to escape from his van and run from police at that point, does provide a motive to at least believe that the victim was the one who set up that transaction and set up for the police to come . . . arrest him." N.T. Trial, 8/10/15, at 12.

At the hearing on Knox's motion to dismiss, Attorney Jason testified that, although in retrospect it was a mistake to ask Rosario's sister to translate for him, he "[d]idn't intend anything by it." N.T. Motion Hearing, 2/20/18, at 22. In fact, Attorney Jason testified that, after interviewing Rosario and his sister prior to trial, he believed that neither of them would require a translator during their testimony. *See id.* at 21.

With regard to his PowerPoint presentation, Attorney Jason testified as follows:

> Q: Okay. But you still had some stuff in your PowerPoint that referenced that evidence that was not in front of the jury, not on the record.
>
> A: Well, let's be perfectly clear. Just to back up a little bit, before we get to the PowerPoint, I had—and I'm sure you have a copy of my extensive motion *in limine* which outlined both—all of the prior drug dealing incidents, the prior drug dealing incidents involving the defendant and the victims in this case, and the prior occasion on September 11th in which guns and drugs were found in a van that was raided as a result of probation officers approaching the defendant and the victim in Hall Manor.
>
> I'd outline that all extensively. And during a pretrial ruling, the judge at that point, I believe, allowed all of that in. Again, I don't have the transcript right in front of me. But from what I remember, "It's all coming in," was approximately the language that was used at that time.
>
> Throughout the course of the testimony of the last witness in this case, which is Detective Iachini, I believe the judge at that time revised that ruling. But this was after approximately two days['] worth of testimony, and the last witness prior to the closings. So at that point I had not, I believe, the opportunity to review and make the necessary two-word change to the PowerPoint that I think resulted in the issue.

. . .

Q: Okay. And so, if you didn't have time to take it out, you knew it was in there, but you just didn't—you didn't have time to take it out.

A: I mean, I think that it's an unfair distinction, because at the time in which all this change had been happening—there are a lot of things that go into being in the middle of a serious trial. Not having the time, quote/unquote, is that there's a lot of things happening and that it was inadvertent.

It's not that I intentionally said, That's a mistake and I'm leaving it in there. Or that it was, I intentionally know that's there, and I physically don't have the opportunity.

It's—there's a lot going on. There's a condensed lunch break. There's a lot of—there's still witness testimony. There's potential defense witness testimony. And there's a lot happening.

And so when I say that I may not have had the time or I didn't have the time to take it out, that I didn't have—there wasn't, like, an evening break that I could have sat back and pored over my closing PowerPoint and realized that that subsequently changed ruling affected the nature of my PowerPoint. That's what I mean by that.

*Id.* 25-26, 33-34.

In its opinion, the trial court concluded as follows:

In this case, Appellant availed himself of the appellate system which rectifies errors and which has granted him a new trial. Further, the Superior Court found that the issue related to translation was a trial court error and thus we believe it is not attributable to the prosecutor for a claim of prosecutorial misconduct. The second claim of misconduct relates to the PowerPoint presentation during closing arguments.

. . .

We do not find that the prosecutor intentionally left the slides in the presentation. We did rule that there should be no mention of the gun or heroin about two hours prior to closing and we can accept that the prosecutor was unable to adjust his presentation in time. However, it does not appear to have prejudiced the jury in any way. The jury did come back with questions during deliberations, but the issue of the slides was never raised by the

> jury. The record indicates that the jury took their duty seriously and considered their verdict carefully. The prosecutor did not barrage the jury with inadmissible information, he did not appeal to emotions rather than reason.

Trial Court Opinion, 1/22/19, at 4-6.

Upon review, we can discern no error of law or abuse of discretion on the part of the trial court in concluding that Attorney Jason did not act intentionally "to prejudice the defendant to the point of denying him a fair trial." **Smith**, **supra**. With regard to the use of witness Rosario's sister as a translator, there is no evidence to support Knox's claims that "the Commonwealth failed to adequately prepare for trial and to request an interpreter" or that Attorney Jason's intent was to have one Commonwealth witness "clandestinely assist another Commonwealth witness during their testimony." Brief of Appellant, at 15-16. Rather, the evidence demonstrates that, based on his pre-trial conversations with Rosario, Attorney Jason did not believe that Rosario would require an interpreter at trial and it was only when Rosario became "somewhat uncooperative" that Attorney Jason concluded an interpreter might be of assistance. N.T. Motion Hearing, 2/20/18, at 22. Indeed, the majority of Rosario's testimony was given in English, in response to English, without his sister's translation assistance. The record is devoid of any evidence that Rosario was "clandestinely" assisted by his sister to benefit the Commonwealth's case.

As to the PowerPoint presentation, the court credited Attorney Jason's testimony and concluded that, while he "made a mistake by not removing the slide," there was no "overt, intentional conduct." *Id.* at 49. This conclusion

- 11 -

is supported by the record. At trial, the court revised its earlier ruling approximately two hours before closing statements. Attorney Jason, in the midst of a felony trial and with only a very short break between the conclusion of testimony and the commencement of closing arguments, simply did not think to remove the offending slide, which contained information that would have been admissible only two hours before, and which he turned off as soon as defense counsel noted the objectionable content. There was no evidence that Attorney Jason's use of the slides was anything but an unfortunate oversight. Accordingly, the trial court properly denied Knox's motion to dismiss.

Order affirmed.


Judgment Entered.

_____
Joseph D. Seletyn, Esq.
Prothonotary

Date: 02/15/2019