J-A18001-20

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| CARLOS HARRIS | : | |
| | : | |
| Appellant | : | No. 481 WDA 2019 |

Appeal from the Judgment of Sentence Entered August 7, 2018
In the Court of Common Pleas of Allegheny County Criminal Division at
No(s):  CP-02-CR-0011917-2015

BEFORE:  BENDER, P.J.E., DUBOW, J., and NICHOLS, J.

MEMORANDUM BY BENDER, P.J.E.:                    **FILED OCTOBER 1, 2020**

Appellant, Carlos Harris, appeals *nunc pro tunc* from the judgment of sentence of an aggregate term of 17–34 years' incarceration, imposed following his conviction, after a second trial, for one count of third-degree murder, two counts of attempted murder, and related offenses.  Appellant challenges the sufficiency of the evidence as it pertains to his identity as the perpetrator of the shooting.  Additionally, Appellant alleges that his second trial should have been barred on double-jeopardy grounds due to prosecutorial misconduct during the first trial.  After careful review, we affirm with respect to Appellant's sufficiency claim.  However, we vacate his judgment of sentence and remand for a double-jeopardy hearing.

The facts adduced at Appellant's second, non-jury trial were as follows:

[O]n August 24, 2015[,] at approximately 11:24 a.m., Michael Shipp ("Shipp") and Jaron Satterwhite ("Satterwhite") were walking on East 12th Street in Homestead, Pennsylvania.  Daren

Scott ("Scott") drove up to the men, and they began to talk. Shipp entered Scott's vehicle on the front passenger side, and Satterwhite entered in the back passenger side. They drove down the street, and Scott pulled the vehicle over to the side to allow Shipp and Satterwhite to exit. As they were sitting in the vehicle, shots rang out. All told, 19 shots were fired at the vehicle and the individuals occupying it. When the shooting began, Shipp and Scott ran from the vehicle, and Satterwhite ducked. Satterwhite was unable to exit the vehicle due to child safety locks. Once the shots stopped, Satterwhite reached his arm out of the vehicle, opened the door and ran. While Scott was running away from the vehicle, one of the shots hit him. He died at the scene.

Dr. Abdulrezak Shakir, the Deputy Medical Examiner for the Allegheny County Medical Examiner's Office, testified that Scott died from a gunshot wound to the trunk that entered in his left lower back and exited from the middle of his chest. This gunshot wound was fatal, as it went through several vital organs, including his heart.

Allegheny County Homicide Detectives arrived at the scene approximately two (2) hours after the shooting. Detective Stephen Hitchings testified that bullet casings were located in front of 339 E. 12th Street, Homestead. By looking at the characteristics of the firing pin impressions on the bullet casings, Detective Hitchings knew that the firearm that discharged the bullets was a Glock. Based upon the location of the casings, it was likely that the "shooter [was] standing somewhere in the general area of the right corner of 339 E. 12th Street shooting at [Scott's] vehicle." Detective Hitchings obtained consent from the lessor/owner of the apartment building located at 339 E. 12th Street and entered the building. Specifically, Apartment 2, owned/leased by Sharon Fisher, was of interest to him due to its location. When he entered Apartment 2, 339 E. 12th Street, he saw a firearm spring sitting on the floor towards the living room area. Based upon his knowledge and experience, Detective Hitchings knew that this spring came from a Glock pistol. Detective Hitchings began to search the apartment for the rest of the firearm. He looked in a closet and pulled out a towel that was stuffed into it. As he pulled out the towel, it unrolled and the lower receiver of a Glock pistol fell out. Detective Hitchings then noticed that the bottom of a chair in the living room was ripped out. He reached into the chair, and found a t-shirt. Inside the t-shirt were the other missing pieces of the Glock: the upper receiver and the barrel. At this time, Detective Hitchings had recovered all of the

pieces necessary to assemble the Glock. William Best, an expert in firearms and ballistics, assembled the recovered Glock and tested it. It was found to be operable. There were no fingerprints of any value found on this firearm.

The Allegheny County Detectives and the Mobile Crime Unit recovered nine (9) bullet casings on August 24, 2015[,] mostly from the area in between 337 E. 12th Street and 339 E. 12th Street. After a civilian provided an audio recording of the shooting, Allegheny County Detectives determined that there were a total of 19 shots fired. As such, on August 25, 2019, Detectives returned to the scene and located the remaining ten (10) casings. All 19 bullet casings were analyzed and found to match the Glock found in Apartment 2, 339 E. 12th Street by Detective Hitchings.

While the Mobile Crime Unit was processing the scene, Allegheny County Detectives and [p]olice [o]fficers from Homestead and Munhall were stationed at the front and back entrances to 339 E. 12th Street. At approximately 1:30 p.m., a young man, later identified as Carlos Harris ("[Appellant]"), exited the front door and ran into Allegheny County Homicide Detective Thomas Foley. Detective Foley testified that [Appellant] stated that he was coming out of Sharon Fisher's apartment and appeared to be nervous. [Appellant] admitted to being in possession of marijuana, and was placed under arrest. [Appellant]'s hands were tested for gun[]shot residue ("GSR"). According to Daniel Wolfe, an expert from the Allegheny County Medical Examiner's Office, the GSR test from the sample taken from the back of [Appellant]'s right hand was positive.

At about this same time, Rafiel Hoston ("Hoston") exited the rear of the building. After initially speaking with detectives at the scene, Hoston went to the police station to make a formal statement. Hoston was interviewed by Detective Patrick Miller of the Allegheny County Police. Hoston told Detective Miller that he was drinking at Pearl's Café when he received a call from Shawn Phenizy, Sharon Fisher's son, who asked him to go [to] his apartment to take care of his dog, Miami. Hoston told Detective Miller that he was only in Apartment 2 for a few minutes due to the "commotion" outside. He testified that the back door of this apartment is always open so that anyone can go in and out, including [Appellant]. He told Detective Miller that [Appellant] was in Apartment 2. Hoston's hands were tested for GSR. This test was negative. Additionally, Detective Miller confirmed

[Hoston]'s alibi that he was drinking at Pearl's Café at the time of the shooting.

Allegheny County detectives submitted the following evidence taken from Apartment 2, 339 E. 12th Street to the Medical Examiner's Office for DNA collection and testing: a cloth, the Glock, the towel that contained pieces of the Glock, and t-shirt that contained the remaining pieces of the Glock. Anita Lorenz, an expert in the field of DNA collection and testing, testified that the DNA samples from a cloth matched DNA sample of Satterwhite. With regard to the pieces of the Glock, Ms. Lorenz testified that she was unable to draw any conclusions or find a statistical match, as there were four or more contributors of DNA on these items. She further recommended that this sample be sent for "TrueAllele" testing. Ashley Platt, an expert in the field of DNA analysis, testified that she examined the DNA results from the towel, and that due to the number of contributors, she was unable to make a comparison. Further, she examined the DNA results of the t-shirt, which [were] a match to [Appellant].

Dr. Mark Perlin, the Chief Executive and Scientist at Cybergenetics, testified regarding the results of the TrueAllele analysis. Dr. Perlin created the company known as Cybergenetics and developed technology called TrueAllele, which takes data generated from the crime lab and infers genotypes so that it can separate multiple contributors and make a comparison to known contributors. In March 2016, Cybergenetics received DNA data from the Allegheny County Medical Examiner's Office from the samples taken from the Glock as well as four reference samples belonging to [Appellant], Shipp, Scott, and Satterwhite. The Glock pistol frame and the Glock pistol slide contained DNA that were statistical matches to [Appellant]. In May 2019, Cybergenetics analyzed data from the swabbing of the t-shirt and towel as well as two (2) new references: Hoston and Shawn Phenizy. Both items contained statistical matches to [Appellant].

Trial Court Opinion ("TCO"), 7/11/19, at 3-7 (citations omitted).

The Commonwealth charged Appellant with a general count of criminal homicide, 18 Pa.C.S. § 2501(a); two counts of attempted homicide, 18 Pa.C.S. § 901(a); two counts of aggravated assault, 18 Pa.C.S. § 2702(a)(1); person not to possess a firearm, 18 Pa.C.S. § 6105(a)(1); and tampering with

evidence, 18 Pa.C.S. § 4910(1). A non-jury trial commenced in November of 2017. On December 7, 2017, the trial court declared a mistrial due to "documentary evidence being produced [by the Commonwealth] for the first time during trial." TCO at 1. Appellant filed a motion to bar re-trial on double-jeopardy grounds on March 12, 2018.

A second non-jury trial began in May of the following year and, on May 21, 2018, the trial court found Appellant guilty of third-degree murder.[1] Appellant was also convicted at all but one of the remaining counts. The trial court found Appellant not guilty of the person-not-to-possess-a-firearm offense. On August 7, 2018, the court sentenced Appellant to 17–34 years' incarceration for third-degree murder, and to concurrent terms of 10-20 years' incarceration for each count of attempted murder, for an aggregate term of 17–34 years' incarceration. Appellant did not file post-sentence motions or a direct appeal. On February 1, 2019, Appellant filed a timely Post Conviction Relief Act petition seeking reinstatement of his direct appeal and post-sentence motion rights *nunc pro tunc*. The lower court granted the petition on February 4, 2019.

Appellant thereafter filed a post-sentence motion *nunc pro tunc* on February 14, 2019, which the trial court denied on February 25, 2019. He filed a timely notice of appeal *nunc pro tunc*, and a timely, court-ordered

---

[1] 18 Pa.C.S. § 2502(c).

Pa.R.A.P. 1925(b) statement. The trial court issued its Rule 1925(a) opinion on July 11, 2019.

Appellant now presents the following questions for our review:

I. The Commonwealth has the duty to engage in good faith discovery and avoid intentionally provoking a mistrial. In the instant case, the Commonwealth revealed lengthy and ultimately inadmissible discovery to the defense in the middle of trial, resulting in a mistrial. Accordingly[:]

Did the trial court abuse its discretion in failing to bar retrial based on intentionally flagrant and deleterious prosecutorial misconduct aimed at causing a mistrial to gather additional evidence in direct response to the defense's questioning during the first trial?

II. With regards to [Appellant]'s convictions for third-degree murder, criminal attempt–homicide, attempted homicide, aggravated assault, and tampering with evidence, the Commonwealth relied on DNA evidence to link [him] to the firearm used in the shooting. However, the Commonwealth failed to present testimony that the DNA was not on the firearm due to passive transfer. Accordingly[:]

Did the Commonwealth fail to present sufficient evidence that [Appellant] was the individual who fired the bullets towards the decedent and other victims and that [Appellant] subsequently dismantled the firearm?

Appellant's Brief at 7. For ease of disposition, we will address these issues in reverse order.

## Sufficiency of the Evidence

Appellant asserts that the evidence was insufficient to demonstrate his identity as the shooter.

A claim challenging the sufficiency of the evidence is a question of law. Evidence will be deemed sufficient to support the verdict when it establishes each material element of the crime charged and the commission thereof by the accused, beyond a reasonable doubt. Where the evidence offered to support the verdict is in

- 6 -

contradiction to the physical facts, in contravention to human experience and the laws of nature, then the evidence is insufficient as a matter of law. When reviewing a sufficiency claim[,] the court is required to view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence.

***Commonwealth v. Widmer***, 744 A.2d 745, 751 (Pa. 2000) (internal citations omitted).

This Court has previously recognized that,

even though 'vague, tenuous and uncertain' identifications standing alone are insufficient, ***see Commonwealth v. Farrington***, … 280 A.2d 623 ([Pa. Super.] 1971); ***Commonwealth v. Sharpe***, … 10 A.2d 120 ([Pa. Super.] 1939), our courts have held that 'evidence of identification ... need[ not] be positive and certain in order to convict, although any indefiniteness and uncertainty in the identification testimony goes to its weight.' ***Commonwealth v. Hickman***, … 309 A.2d [ 564,] 566 ([Pa.] 1973).

***Commonwealth v. Minnis***, 458 A.2d 231, 233 (Pa. Super. 1983). Moreover, "[d]irect evidence of identity is … not necessary and a defendant may be convicted solely on circumstantial evidence." ***Hickman***, 309 A.2d at 566.

Here, proof of Appellant's identity was not the product of direct evidence, but was instead based on a confluence of circumstantial evidence. First, police discovered Appellant near the scene of the crime, two hours after the shooting. Second, Appellant emerged from a residence where the murder weapon was ultimately discovered.[2] Third, traces of Appellant's DNA were

---

[2] Notably, police arrived on the scene immediately after the shooting, and did not observe anyone else entering or exiting the home until Appellant emerged two hours later. ***See*** TCO at 7.

discovered on the clothing that held the disassembled murder weapon, and on parts of the weapon itself. Fourth, when police tested Appellant for GSR, the test indicated that he had recently fired a gun. None of these facts were alone sufficient to establish identity. However, collectively considered, the trial court concluded that this circumstantial evidence was legally sufficient to establish Appellant's identity as the shooter. **See** TCO at 8.

Appellant now argues on appeal that the

Commonwealth failed to prove beyond a reasonable doubt that [Appellant] handled the firearm used in the shooting, let alone that he was the shooter. No eyewitness saw the shooter, so there was no identification or description provided. No motive was established. No fingerprints were recovered from the firearm. [Appellant]'s mere presence in the unsecured apartment where the firearm was located failed to establish his possession of the firearm.

Furthermore, the forensic evidence could not show when or how [Appellant]'s DNA got onto the firearm, such as by secondary DNA transfer from the towel and t-shirt which swathed the firearm parts. Without any expert testimony to reject secondary DNA transfer from the towel and t-shirt on to the firearm, the Commonwealth lacked sufficient evidence to convict [Appellant]. Even assuming *arguendo* that the DNA evidence was sufficient to place the firearm in [his] hands, there was still no evidence that he possessed the firearm at the time of the shooting.

Appellant's Brief at 7.

We agree with the trial court that Appellant's sufficiency claim is meritless. The confluence of circumstances here were sufficient to establish his identity as the shooter, despite the lack of direct evidence. Appellant's

theory that secondary DNA transfer[3] might explain the presence of his DNA on the gun goes primarily to the weight, not the sufficiency of the DNA evidence. Under the sufficiency standard, we are not permitted to second-guess the manner in which the jury weighed the evidence. Instead, we must "view the evidence in the light most favorable to the verdict winner giving the prosecution the benefit of all reasonable inferences to be drawn from the evidence." **Widmer**, 744 A.2d at 751.

In any event, Appellant fails to provide any case law in support of the notion that the Commonwealth had a burden to disprove his secondary DNA transfer theory. Although the Commonwealth bears the specific burden to disprove affirmative defenses such as self-defense, Appellant raised no affirmative defenses at trial. As to other defense theories that do not constitute affirmative defenses, our Supreme Court has stated that "the Commonwealth's burden to prove beyond a reasonable doubt all elements of the crime does not require it to disprove a negative" and, "[o]nce a defendant has come forward with" evidence that might tend to disprove an element of a crime, "or it is in the case otherwise, the Commonwealth … may introduce testimony to refute it, but is under no duty to do so." **Commonwealth v. Rose**, 321 A.2d 880, 884-85 (Pa. 1974) (reasoning that the prosecution did not have the burden to disprove a defense theory of diminished capacity by

_____

[3] Essentially, this theory suggests that the DNA discovered on the gun could have originated from the clothing in which the gun parts were discovered, and not from Appellant's handling of the firearm during and immediately after the shooting.

intoxication, even when the defendant had presented evidence to that effect, but that did not mean that the trial court could place a burden on the defendant by instructing the jury that he was required to prove intoxication by a preponderance of the evidence). Here, the Commonwealth was not required to disprove the secondary DNA transfer theory to meet its burden.

We agree with the Commonwealth that Appellant's theory was presented to the factfinder, and the factfinder was free to reject it. As the Commonwealth explained:

> [A]s to the theory of secondary DNA transfer, the factfinder received scientific evidence that [Appellant]'s theory of the case— that his DNA was on the gun because it had been transferred from the t-shirt to the gun—was vastly less likely than the reverse. The evidence showed that transfer of DNA from a hard, nonporous surface like a gun to a soft cotton surface like a t-shirt was vastly more likely. ([] the Commonwealth's expert testif[ied] that, according to an authoritative study, about .01% of DNA moves from a soft cotton surface to a hard, nonporous surface, whereas nearly 100% of DNA will transfer in the other direction.) Even though, as [Appellant] correctly points out, the Commonwealth's expert was not permitted to give an expert opinion about secondary DNA transfer ([Appellant's Brief] at 66), the factfinder still heard the underlying scientific evidence, and was free to make the inference that secondary DNA transfer from the t-shirt to the gun was likely not the reason why [Appellant's] DNA was on the gun.
>
> ...
>
> [A] rational finder of fact could conclude that [Appellant's] DNA was on the murder weapon because he had handled it, not because of secondary DNA transfer. It could conclude that [Appellant] had gunshot residue on his hands because he had recently fired a gun. It could conclude that, since [Appellant] was apprehended after leaving the apartment containing the disassembled and stashed murder weapon, that it was he who had done the disassembling and stashing. And based on all of this

combined, a rational finder of fact could conclude that it was [Appellant] who fired the bullet that killed Daren Scott.

Commonwealth's Brief at 31-32 (citations to trial transcript omitted).

We agree with the Commonwealth's analysis, and the trial court's determination that the evidence was sufficient to establish Appellant's identity as the shooter. No relief is due on this claim.

## **Double Jeopardy**

Next, Appellant asserts that double-jeopardy principles barred his retrial due to prosecutorial misconduct during the first trial. Specifically, he claims that the trial prosecutor "deliberately engaged in flagrant and deleterious discovery conduct intended to provoke a mistrial and obtain additional time to prepare its case against" Appellant. Appellant's Brief at 28. The trial court determined that the misconduct warranted a new trial, but that it was not deliberately intended to deprive Appellant of a fair trial. ***See*** TCO at 9 (stating, "it is clear to this [c]ourt that the actions giving rise to [Appellant]'s request for a mistrial were not done with the intent to provoke [him] into moving for a mistrial nor were they done in bad faith").

"[O]ne of the principal threads making up the protection embodied in" the double-jeopardy clause of the federal constitution "is the right of the defendant to have his trial completed before the first jury empaneled to try him." ***Oregon v. Kennedy***, 456 U.S. 667, 673 (1982). Under the federal standard, re-trial of a defendant is barred by double-jeopardy principles when prosecutorial misconduct "giving rise to the successful motion for a mistrial

was intended to provoke the defendant into moving for a mistrial." *Id.* at 679.

In Pennsylvania, it has long been the rule "that the double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, but also when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992). In *Smith*, legally sufficient evidence established that the defendant had murdered a woman and her two children in order to capitalize on a life insurance policy. *Id.* at 322. However, during Smith's trial, the Commonwealth had concealed potentially exculpatory evidence, both physical evidence recovered from the scene of the crime, and impeachment evidence concerning a key Commonwealth witness. *Id.* at 322-23. The *Smith* Court determined that, even if Smith's retrial was not barred under the federal standard, the double-jeopardy clause of the Pennsylvania Constitution prohibited it.

Recently, our Supreme Court expanded this double-jeopardy safeguard under the Pennsylvania Constitution to include reckless prosecutorial misconduct, holding that under

> Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double[-]jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such

- 12 -

will be the result. This, of course, is in addition to the behavior described in **Smith**, relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial.

**Commonwealth v. Johnson**, 40 EAP 2018, 2020 WL 2532671, at *15 (Pa. May 19, 2020).

Here, Appellant argues that the trial prosecutor's repeated discovery violations were intentionally designed to deprive him of a fair trial, or to provoke him into filing a motion for a mistrial. Alternatively, Appellant contends that conduct was at least reckless to a degree that the prosecutor consciously disregarded a substantial risk of an unfair trial, and, therefore, that he is entitled to relief under **Johnson**.[4]

The undisputed facts concerning the various pieces of evidence that were not disclosed to the defense prior to Appellant's first trial are as follows.

The Phone Dump

---

[4] **Johnson** was decided after Appellant filed his notice of appeal, but before he filed his brief. When "an appellate decision overrules prior law and announces a new principle, unless the decision specifically declares the ruling to be prospective only, the new rule is to be applied retroactively to cases where the issue in question is properly preserved at all stages of adjudication up to and including any direct appeal." **Commonwealth v. Cabeza**, 469 A.2d 146, 148 (Pa. 1983).

Here, Appellant has satisfied the procedural requirements for retroactive application of **Johnson**. In his motion seeking to bar retrial on double-jeopardy principles, he not only raised the claim that the prosecutor's misconduct was intentional, but also claimed that, "at the very least[,]" the misconduct was "reasonably expected … to invoke [Appellant] to move for a mistrial." Apppellant's Double[-]Jeopardy Motion, 3/19/2018, at 6 ¶ 23. This sufficiently invokes the recklessness standard enunciated in **Johnson** to preserve such a claim for our review.

During cross-examination by the defense on the first day of the first trial, a police officer testified that Appellant's phone had been seized pursuant to his arrest, and that a search warrant was issued to search its contents. No evidence from that search was provided to the defense in the normal course of discovery. However on the second day of trial, the prosecutor disclosed to the defense 869 pages of cell phone records. The trial court granted the defense a continuance to review the newly-disclosed records, and warned the prosecution against any more evidentiary surprises. However, the court and the parties ultimately agreed that the phone records were inadmissible. No evidence from the phone dump was admitted at either trial.

### Hoston's GSR test

During cross-examination of a police officer on the second day of the first trial, it became clear that a GSR swab had been taken from Hoston on the day of the shooting, but had never been tested. The prosecutor immediately ordered a test of that swab. The test came back negative, and was turned over to the defense on the day the trial reconvened after the postponement granted for review of the phone records. This evidence was admitted into evidence by the Commonwealth at the second trial.

### The Bullet Fragment Report

The bullet fragments discovered in the victim's vehicle were not initially tested by the Commonwealth. The prosecutor indicated that he ordered the fragments to be tested at the beginning of or just before the first trial began. The report came back during trial, and the prosecutor turned it over to the

defense with the results of the GSR test of Hoston. The results were inconclusive; the fragments appeared to be .40 caliber, but they were too small or damaged to conclusively prove that they had been, or had not been, fired from the at-issue firearm. This evidence was ultimately admitted at the second trial.

### Additional DNA Testing

Initially, the prosecutor only ordered the gun tested for DNA evidence. When the defense cross-examined the Commonwealth's expert witness at trial, it became apparent that no testing had been ordered or done on the towel and t-shirt in which the pieces of the gun were discovered. The prosecutor ordered those items tested, the results of which were not available until the second trial.

Appellant claims:

> In the nine months leading up to the start of [Appellant]'s first trial, the Commonwealth had been engaged in a sustained campaign of providing last-minute discovery to the defense. By the end of the first day of trial, trial counsel had elicited testimony that none of the phones taken from the scene had been analyzed and that there had been no forensic tests done on Hoston's GSR kit or the t-shirt and towel that enfolded the pieces of the Glock. Upon being informed by the officers questioned about the existence of the phone analysis, Prosecutor Avetta learned that a phone dump had been conducted on [Appellant]'s phone but had not been disclosed to defense counsel. By that point, the evidence should have been disclosed to the defense and excluded for discovery violations, but Prosecutor Avetta had a different plan.

> On the second day of trial, Prosecutor Avetta handed over hundreds of pages of previously undisclosed and ultimately inadmissible cellphone data to the defense and sought to introduce it that day despite not having reviewed it. While the

defense received a week to review the materials, Prosecutor Avetta violated a court pronouncement by obtaining additional evidence to rebut the weaknesses exposed by the defense on the first day of trial.

Prosecutor Avetta's pithy explanations relating to the use and procurement of this additional evidence after the defense had undermined significant pieces of the Commonwealth's case show that the Prosecutor needed time to obtain further evidence and strengthen his case with a second round of testimony. However, the Prosecutor had insufficient [Pa.R.Crim.P.] 600 time left to prepare all of the additional evidence needed to respond to the defense's case.

Prosecutor Avetta then disclosed additional evidence to defense counsel just before trial was to resume, thus provoking the mistrial, to continue to gather critical evidence.

Appellant's Brief at 24-25.

Appellant further argues the prosecutor had a motive to engage in misconduct that would provoke a mistrial request by the defense, because

the mistrial presented the Commonwealth with an opportunity to prepare additional, favorable evidence, namely DNA evidence and testimony on secondary DNA transfer, that it did not have initially and that it uncovered in response to the defense's questioning at trial. Without this time, the Commonwealth would have had no testimony or response to the defense theory of the case.

*Id.* at 52 (footnote omitted). Appellant contends that the prosecutor

intended to both force the defense to proceed without proper disclosure or review of evidence provided after trial commenced and to provoke a mistrial to obtain further forensic evidence to rebut the defense, including its theory of secondary DNA transfer. All told, this misconduct deprived [Appellant] of a fair trial.

*Id.* at 54.

After accurately stating the pre-***Johnson*** double-jeopardy standard for barring retrial due to prosecutorial misconduct, the entirety of the trial court's analysis of this claim is as follows:

- 16 -

In this matter, it is clear to this [c]ourt that the actions giving rise to [Appellant]'s request for a mistrial were not done with the intent to provoke [Appellant] into moving for a mistrial nor were they done in bad faith. The prosecution's delay in providing discovery in a timely fashion to [Appellant] was arguably dilatory, but it did not rise to the level of prosecutorial misconduct. As such, this [c]ourt found that the Double Jeopardy Clause did not bar retrial of [Appellant] following the December 7, 2017 mistrial.

TCO at 9.

The Commonwealth argues:

1. None of this evidence was intentionally withheld, at any point, and was in fact turned over as soon as the prosecutor personally obtained it;

2. There is no point at which the Commonwealth is obligated to stop a criminal investigation, so there is nothing illegal or unethical about a prosecutor ordering follow-up testing, even in the middle of trial or after a mistrial is declared. A trial court cannot lawfully order the Commonwealth to stop investigating a crime, or to stop turning over discovery to the defense;

3. This evidence, even taken collectively, had much less of an impact on the strength of the Commonwealth's case than [Appellant] insists. In fact, the Commonwealth began the second trial in a virtually identical evidentiary position as it began the first trial; and

4. The most [Appellant] is entitled to is a second trial. He has already gotten this. There is nothing further for this Court to do.

Commonwealth's Brief at 12-13.

Given the trial court's cursory analysis of Appellant's double-jeopardy claim,[5] as well as the new standard set forth in ***Johnson***, we conclude that we are unable to assess whether Appellant's double-jeopardy rights were

---

[5] The trial court heard argument from the parties on Appellant's double-jeopardy motion to dismiss at a hearing held on May 7, 2018. The trial court did not provide any more explanation for its ruling at that time.

violated based on the record before us. The trial court did not make any specific factual findings regarding the prosecutor's dilatory disclosures to aid our review, nor did the court hear any testimony relevant to the double-jeopardy claim at the May 7, 2018 double-jeopardy hearing. To the extent that the trial court implies that the record clearly supports its conclusion that the prosecutor did not intend to provoke a mistrial or deprive Appellant of a fair trial, we disagree. The record is not clear either way.

Nor does the record clearly undermine the claim that the prosecutor exercised a "conscious disregard for a substantial risk" that his dilatory disclosures would deprive Appellant of a fair trial. ***Johnson***, 2020 WL 2532671, at *15. It is in this regard that the prosecutor's testimony, subject to cross-examination, would be particularly valuable in determining whether a double-jeopardy violation occurred in this case. Unfortunately, the record only contains the prosecutor's averments in his capacity as counsel for the Commonwealth. The arguments of counsel are not evidence, and those statements were not subject to rigors of cross-examination. Furthermore, the trial court did not specify which statements it deemed credible, if any, or if it based its determination on the gravity of the prosecutorial misconduct alone, irrespective of the prosecutor's intent. Moreover, the trial court's assertion in its Rule 1925(a) opinion that the prosecutor did not engage in misconduct is incompatible with the fact that it granted a mistrial based on the prosecutor's dilatory disclosures.

Nevertheless, the Commonwealth asserts that any prejudice resulting from the prosecutor's misconduct was adequately cured by the trial court's granting Appellant a new trial. However, the Commonwealth misconstrues or misunderstands the nature of the right at issue. A defendant's due process right to *a fair trial* can be cured by a new trial in most cases. However, the double-jeopardy clause goes further, and "protects a defendant's interest in having his fate decided *by his first jury*." *Id.* at *9 (emphasis added). The fact that Appellant's second trial proceeded without the prosecutorial mishaps of the first did not cure the harm of multiple prosecutions for the same offense, which is the primary concern of double-jeopardy protections. The double-jeopardy clause "prevents a prosecutor or judge from subjecting a defendant to a second prosecution by discontinuing the trial when it appears that the jury might not convict." *Green v. U.S.*, 355 U.S. 184, 188 (1957). When double-jeopardy principles bar a retrial, it is not because a fair trial cannot be obtained in a subsequent prosecution. Instead, the purpose of the remedy is to deny the reward of a second trial to a prosecutor who intentionally or recklessly sabotages the first in order to avoid an acquittal.

Nevertheless, it is true that "not all intentional misconduct is sufficiently egregious to be classified as overreaching and, as such, to invoke the jeopardy bar." *Johnson*, 2020 WL 2532671, at *11. It must also be true that not all reckless prosecutorial misconduct warrants the extreme remedy of barring re-trial. Thus, in addition to the specific intent or recklessness of the prosecutor, double jeopardy is not implicated unless the misconduct itself is severe. *Id.*

However, the fact that the prejudice stemming from such misconduct can be cured by a second trial is not a valid consideration in assessing a double-jeopardy claim. Thus, we disagree with the Commonwealth that Appellant's second trial was a sufficient remedy to address Appellant's double-jeopardy claim.

Because the record does not obviously show that the prosecutor's actions fell below the double-jeopardy standard of reckless or intentional conduct designed to deprive Appellant of a fair trial (or to provoke him into moving for a mistrial), and because that appears to be the only basis for the trial court's decision to deny Appellant's double-jeopardy motion, we conclude that the court abused its discretion in denying that motion. Accordingly, we vacate Appellant's judgment of sentence and remand for a double-jeopardy hearing consistent with this memorandum.[6]

Judgment of sentence **vacated**. Case **remanded** for a double-jeopardy hearing. Jurisdiction **relinquished**.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary


Date: 10/1/2020

---

[6] If the trial court again decides to deny the motion, it shall re-impose Appellant's judgment of sentence, from which Appellant may appeal.