**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT I.O.P. 65.37**

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| ERIC TORRES | : | |
| Appellant | : | No. 66 EDA 2020 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011169-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| ERIC TORRES | : | |
| Appellant | : | No. 67 EDA 2020 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011170-2013

| | | |
|---|---|---|
| COMMONWEALTH OF PENNSYLVANIA | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| v. | : | |
| ERIC TORRES | : | |
| Appellant | : | No. 68 EDA 2020 |

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011171-2013

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                               :           PENNSYLVANIA
                               :
              v.                    :
                               :
                               :
ERIC TORRES                    :
                               :
            Appellant         :     No. 69 EDA 2020

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011172-2013

COMMONWEALTH OF PENNSYLVANIA : IN THE SUPERIOR COURT OF
                               :           PENNSYLVANIA
                               :
              v.                    :
                               :
                               :
ERIC TORRES                    :
                               :
            Appellant         :     No. 70 EDA 2020

Appeal from the Order Entered October 17, 2019
In the Court of Common Pleas of Philadelphia County Criminal Division at
No(s): CP-51-CR-0011173-2013

BEFORE: OLSON, J., KING, J., and McCAFFERY, J.

MEMORANDUM BY McCAFFERY, J.:              **FILED APRIL 25, 2022**

       Eric Torres (Appellant) filed these consolidated appeals[1] from the orders

entered in the Philadelphia County Court of Common Pleas denying his motion

to bar prosecution under the double jeopardy clause.[2] Appellant argues the

---

[1] On January 7, 2020, this Court granted Appellant's petition to consolidate the above-captioned appeals. *See* Order, 1/7/20.

[2] *See* U.S. CONST. amend. V; PA. CONST. art. 1 § 10.

trial court erred or abused its discretion when it determined the Commonwealth's misconduct, which warranted the court's declaration of a mistrial, was not intended to prejudice Appellant or deny him a fair trial. Further, he contends that even if the Commonwealth's reckless action was unintentional, it evidenced such a deliberate indifference to trial preparation as to establish the functional equivalent of intentional misconduct. For the reasons below, we affirm.

A detailed recitation of the facts underlying Appellant's arrest and conviction were provided by this Court in a prior appeal, and we need not reiterate them herein. *See Commonwealth v. Torres*, 177 A.3d 263, 265-69 (Pa. Super. 2017), *appeal denied*, 189 A.3d 375 (Pa. 2018). Suffice it to say, on August 13, 2013, a Philadelphia police officer initiated a traffic stop of the car Appellant was driving. *See id.* at 265. When Appellant acted suspiciously, the officer requested he step out of the vehicle. *Id.* Instead, however, Appellant drove away and a high-speed chase ensued. *Id.* Appellant eventually crashed, but fled the scene on foot. *Id.* at 266. Soon thereafter, he was apprehended at a grocery store. *Id.* During a struggle to control Appellant, the officers observed he had a gun. *Id.* Moments later, a shot was fired, striking Philadelphia Police Officer Edward Davies in the abdomen. *Id.* at 267.

After Appellant was arrested, the police obtained a search warrant for his vehicle[3] and his home. They recovered drugs and paraphernalia from both locations. *See Torres*, 177 A.3d at 268. Moreover, "[t]he search of [Appellant's] home produced a 9 mm Zoraki model gun[.]" Trial Ct. Op. 5/24/21, at 5. Appellant was charged over five dockets, but the cases were tried together.[4] Following a jury trial, Appellant was convicted of multiple offenses, including assault of a law enforcement officer, persons not to possess a firearm, and possession with intent to deliver controlled substances.[5] On July 8, 2015, the trial court sentenced Appellant to an aggregate term of 66 to 132 years' imprisonment.

On direct appeal, Appellant argued, *inter alia*, that the trial court erred in denying his pretrial motion to suppress the evidence seized from his home because the affidavit in support of the search warrant was not supported by probable cause "that connecting evidence would be found at [his] home." *Torres*, 177 A.3d at 269. This Court agreed, concluding "police did not have

---

[3] The police also obtained a warrant for a second vehicle, but that search yielded no relevant evidence. *See Torres*, 177 A.3d at 276.

[4] The charges at Docket CP-51-CR-011169-2013 involve the shooting of the Officer Davies, as well as firearm offenses. The charges at Dockets CP-51-CR-0011170-2013, CP-51-CR-0011171-2013, and CP-51-CR-0011172-2013 involve Appellant's assault of the other officers who apprehended him. Finally, the charges at Docket CP-51-CR-0011173-2013 concern drugs recovered from Appellant's car and home.

[5] *See* 18 Pa.C.S. §§ 2702.1(a) and 6105(a)(1); 35 P.S. § 780-113(a)(30), respectively.

probable cause to search [Appellant's] home[,]" and therefore, Appellant was entitled to a new trial "without introduction of the evidence retrieved from [his] home."[6]   ***Id.*** at 275, 276.   The Pennsylvania Supreme Court subsequently denied the Commonwealth's petition for allowance of appeal. ***See Torres***, 189 A.3d 375.

Upon remand, Appellant filed a motion *in limine* requesting, *inter alia*, that the trial court "exclude all evidence recovered from [his] home" in compliance with the Superior Court's ruling.  Appellant's Motions in Limine, 8/20/19, at 2.   During an August 22, 2019, pretrial hearing, the Commonwealth agreed that "[o]bviously, . . . all the evidence" from Appellant's home would be excluded at the retrial.  ***See*** N.T., 8/22/19, at 30 (Commonwealth's attorney stating, "No problem with that.").  The trial court subsequently entered an order granting Appellant's request to exclude all evidence recovered from his home.  ***See*** Order, 8/23/19.

Appellant's retrial commenced with jury selection on September 10, 2019.  Prior to the start of testimony on September 11th, Appellant's counsel — Jonathan Strange, Esquire[7] — informed the court that the Commonwealth's

_____

[6] We note Judge Moulton filed a concurring opinion to express his concern about the case law relied upon by the Majority.  ***See Torres***, 177 A.3d at 278 (Moulton, J. concurring).  Nevertheless, he agreed that "the Commonwealth's affidavit of probable cause failed to establish a sufficient nexus between the crimes under investigation and the search proposed in the warrant."  ***Id.*** (footnote omitted).

[7] Appellant was also represented by Stefanie Fennell, Esquire.  Both attorneys were employed by the Defenders Association of Philadelphia.

exhibit list, which he received that morning, had "a couple of issues." N.T., 9/11/19 Excerpt, at 3.[8] Namely, Attorney Strange noted that there were "10 or 11 things on [the] list that were . . . items taken from the house" and, therefore, subject to the Superior Court's suppression ruling. *Id.* at 4. Assistant District Attorney Edward Jaramillo (ADA Jaramillo) stated: "This is our discretion, obviously[.] We left them there because this is the original packet [but] it doesn't mean we're going to refer to them but we never know what issue may come up." *Id.* The trial court responded: "[T]hat's probably the answer I was expecting. Things that can't come in don't come in. I don't care what's marked as exhibits." *Id.*

The following day, September 12, 2019, the Commonwealth called Philadelphia Police Officer Raul Ortiz to testify. Officer Ortiz was one of the officers involved in the struggle with Appellant at the grocery store. During direct examination, ADA Jaramillo intended to have Officer Ortiz identify the gun Appellant possessed on the day of the shooting. He approached Officer Ortiz with a gun, which he stated had been "cleared with the Sheriff." N.T., 9/12/19, at 83. ADA Jaramillo asked the officer if he recognized that gun, to which the officer replied, "Yes." *Id.* at 83-84. The trial court explained the sequence of events that transpired:

---

[8] This excerpt was attached as an exhibit to Appellant's October 2019 double jeopardy motion. *See* Appellant's Petition to Bar Prosecution as a Violation of Double Jeopardy, 10/9/19, Exhibit 2.

> ADA Jaramillo first approached Officer Ortiz with the silver Zoraki model gun found in [A]ppellant's home which was banned from introduction by [the] Superior Court. ADA Jaramillo then went back to counsel['s] table and switched the silver Zoraki firearm for a black .45 Glock firearm which was confiscated from [A]ppellant at the store following the shooting of [the other officer]. This gun was then shown to Officer Ortiz who was about to describe for the jury how it gets jammed when court was halted, and the jury eventually dismissed. Counsel agreed that both guns were located and removed from the same box at the Commonwealth's counsel's table during the examination of Officer Ortiz.

Trial Ct. Op. at 7, *citing* N.T., 9/12/19, at 87-106.

Attorney Fennell moved for a mistrial "with prejudice," arguing the silver gun displayed to the jury "was to be suppressed" and "both guns were visible to the jury" in the open evidence box on the Commonwealth's table. N.T., 9/12/19, at 87, 100. She emphasized that the defense had expressed concern about the Commonwealth's exhibit list before trial. *Id.* at 89-90. ADA Jaramillo acknowledged he "made a mistake" but insisted there was "nothing to suggest" that the silver gun had anything to do with Appellant. *Id.* at 91. He further assured the trial court: "There's testimony that will come out [that] there's only one gun. We've always made that clear, and it was my mistake." *Id.* at 92. ADA Jaramillo requested the court provide a curative instruction to the jury. *Id.*

After a brief recess, and further argument by counsel, the trial court issued the following ruling from the bench:

> In this case the gun was shown to Officer Ortiz. The gun is a silver gun. It was taken from [Appellant's] house. The Superior Court overturned the previous conviction because the Superior Court ruled that the evidence in that house should not have been allowed in and was so prejudicial as to warrant the overturning of

the verdict. So, the case came back for a second trial because of that.

As a result of that decision, and as a result of what occurred today, what I find is that there was an error made by the prosecution, an inadvertent error of taking the wrong gun and showing it to the officer.

However, by doing that, . . . the silver gun from [Appellant's home] is now in front of the jury. And while I could give a curative instruction to the jury to say to disregard it, they have seen two guns.

And since that gun, specifically from [Appellant's home] can't come in, the only gun that's coming in, the only . . . ballistics evidence that's coming in, is the gun that was taken from [Appellant] after he allegedly shot Officer Davies, which is what he's on trial for. No other ballistics evidence is coming in.

* * *

So, in view of that, and in view of the fact that we have really just started the trial, . . . I believe that in the interest of making sure that this record is completely clean, and that there are no issues about the multiple weapons, and the issues of what the defense can do or not do in terms of a proper defense for [Appellant], I'm going to declare a mistrial. But I am not finding that this was intentional.

* * *

There's no reason to think that this was not an inadvertent error, especially after this case had just started, one officer was testifying about identifying this.

And I think a curative instruction could certainly help, but in an abundance of caution to make sure there's no issues and [Appellant] gets a fair trial, which is what he's entitled to as any other defendant is, I'm going to declare a mistrial. But I am not finding that double jeopardy is in any way implicated.

N.T., 9/12/19, at 107-09. Thereafter, the court scheduled Appellant's retrial

for October 29, 2019.

- 8 -

On October 9, 2019, Appellant filed a petition seeking to bar his prosecution as a violation of double jeopardy. He asserted, *inter alia*, that: (1) the Commonwealth's error was not inadvertent, as it was warned "on several occasions to be careful not to admit inadmissible evidence[;]" (2) the Commonwealth "chose to leave both guns on the witness stand" for the jury to see; and (3) the Commonwealth argued during the first trial that Appellant's "lifestyle . . . made him a person capable" of assaulting police officers. Appellant's Petition to Bar Prosecution as a Violation of Double Jeopardy, 10/9/19, at 5-7 (unpaginated). The trial court conducted a hearing on Appellant's double jeopardy claim on October 17th. Following argument by both counsel, the court denied Appellant's motion as frivolous, and noted that the retrial would proceed as scheduled on October 29th. **See** N.T., 10/17/19, at 20.

On October 21, 2019, Appellant petitioned this Court to review the trial court's determination that his double jeopardy claim was frivolous, and to stay the October 29th retrial.[9] **See** Appellant's Petitions for Review of a Double Jeopardy Frivolous Determination and Application for Extended Stay of Re-

_____

[9] Pursuant to Pennsylvania Rule of Criminal Procedure 587, when a trial court denies a pretrial motion to dismiss based on double jeopardy, it must make a "specific finding" as to whether the motion is frivolous. **See** Pa.R.Crim.P. 587(B)(4). If the court determines it is frivolous, it must inform the defendant of his right to petition this Court for a review of that determination within 30 days. **See** Pa.R.Crim.P. 587(B)(5); **see also** Pa.R.A.P. 1311(a)(3) ("An appeal may be taken by permission from an interlocutory order . . . that determined that a defendant's motion to dismiss on the basis of double jeopardy is frivolous.").

Trial, 10/21/19, at 8 (unpaginated). Because he filed a separate petition for each trial court docket, Appellant also sought to consolidate the cases. *See* Appellant's Petition to Consolidate, 10/24/19. Subsequently, on November 18, 2019, Appellant filed petitions to amend his petition for review to update proceedings that had occurred in the trial court. *See* Appellant's Petitions to Amend, 11/18/19, at 1 (unpaginated). Appellant explained that his third trial began on October 29th, but that another mistrial was granted on October 31st, after "it was brought to the Court's attention by one of the jurors that 5-6 jurors were discussing aspects of the case." *Id.* Trial was once again rescheduled to begin on March 23, 2019.

On January 7, 2020, this Court entered a *per curiam* order granting Appellant's petitions for review, amended petitions for review, and petition to consolidate the appeals. Order, 1/7/20. Thereafter, Appellant complied with the trial court's directive to file a Pa.R.A.P. 1925(b) statement of errors complained of on appeal.

Appellant raises the following two issues for our review:

1. Did not the lower court err and abuse its discretion by denying the motion to bar prosecution as a violation of Double Jeopardy, as the Commonwealth's misconduct was intentional, and was intended to prejudice [Appellant] and deny him a fair trial?

2. Should this Court find that the Commonwealth's misconduct was not conscious and calculated, should it nonetheless find that such deliberate indifference to the preparation and presentation of trial evidence (given the numerous notices and warnings it had received referring to the inadmissibility of suppressed evidence) is nonetheless recklessness that is the functional equivalent of intentional misconduct and is

prosecutorial overreaching meriting a double jeopardy bar of retrial?

Appellant's Brief at 3.

Both of Appellant's issues on appeal challenge the trial court's denial of his motion to dismiss based upon double jeopardy concerns. Our review is guided by the following:

> An appeal grounded in double jeopardy raises a question of constitutional law. This Court's scope of review in making a determination on a question of law is, as always, plenary. As with all questions of law, the appellate standard of review is *de novo*[.] To the extent that the factual findings of the trial court impact its double jeopardy ruling, we apply a more deferential standard of review to those findings[.]

> Where issues of credibility and weight of the evidence are concerned, it is not the function of the appellate court to substitute its judgment based on a cold record for that of the trial court. The weight to be accorded conflicting evidence is exclusively for the fact finder, whose findings will not be disturbed on appeal if they are supported by the record.

*Commonwealth v. Sanchez*, 262 A.3d 1283, 1288 (Pa. Super. 2021) (citations omitted).

"Under both the federal and state constitutions, double jeopardy bars retrial where the prosecutor's misconduct was intended to provoke the defendant into moving for a mistrial." *Commonwealth v. Chmiel*, 777 A.2d 459, 463 (Pa. Super. 2001). However, the Pennsylvania Supreme Court has held that double jeopardy protection under the Pennsylvania Constitution also includes circumstances "when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith*, 615 A.2d 321, 325 (Pa. 1992). In *Smith*, the

Supreme Court concluded the prosecutor's misconduct — which included the "[d]eliberate failure to disclose material exculpatory physical evidence during a capital trial, intentional suppression of the evidence while arguing in favor of the death sentence on direct appeal, and the investigation of [a state trooper's] role in the production of the evidence rather than its own role in the suppression of evidence" — demonstrated misconduct intended to prejudice the defendant and deny him a fair trial. *Id.* at 324, 325. *See also Commonwealth v. Martorano*, 741 A.2d 1221, 1223 (Pa. 1999) (holding prosecutorial misconduct met the "*Smith* standard" when "prosecutor acted in bad faith throughout the trial, consistently making reference to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and . . . repeatedly insisting that there was fingerprint evidence linking [defendants] to the crime when the prosecutor knew for a fact that no such evidence existed").

Recently, in *Commonwealth v. Johnson*, 231 A.3d 807 (Pa. 2020), the Supreme Court further expanded the double jeopardy protections under the Pennsylvania Constitution to include prosecutorial overreaching. The Court opined:

> Under Article I, Section 10 of the Pennsylvania Constitution, prosecutorial overreaching sufficient to invoke double jeopardy protections includes misconduct which not only deprives the defendant of his right to a fair trial, but is undertaken recklessly, that is, with a conscious disregard for a substantial risk that such will be the result. This, of course, is in addition to the behavior described in *Smith*, relating to tactics specifically designed to provoke a mistrial or deny the defendant a fair trial. In reaching our present holding, we do not suggest that all situations involving

- 12 -

serious prosecutorial error implicate double jeopardy under the state Charter. To the contrary, we bear in mind the countervailing societal interests mentioned above regarding the need for effective law enforcement, and highlight again that, in accordance with long-established double-jeopardy precepts, retrial is only precluded where there is prosecutorial **overreaching** – which, in turn, implies some sort of conscious act or omission. Notably, however, this Court has explained, albeit in a different context, that reckless conduct subsumes conscious behavior.

*Id.* at 826 (citations omitted).

In **Johnson**, during the defendant's capital trial for first-degree murder, the Commonwealth "proceeded on the understanding that there was only one baseball cap involved [in the incident] and that it contained both [the victim's] blood and [the defendant's] DNA." **Johnson**, 231 A.3d at 811. However, in fact, there were two baseball caps at the scene of the shooting — each of which was placed on separate property receipts — one with the victim's blood, and the other with the defendant's DNA. **See id.** at 813. Following discovery of the discrepancy and the defendant's request for collateral relief, "the Commonwealth admitted that it had made substantial errors during the trial" and agreed the defendant was entitled to a new trial. **Id.** at 815. The trial court subsequently denied the defendant's motion to bar retrial on double jeopardy grounds, and this Court affirmed. **Id.** at 816.

However, the Supreme Court disagreed. It explained that while the prosecutor did not act "intentionally or with a specific purpose to deprive [the defendant] of his rights, the record [was] consistent with [the trial court's] characterization that [the prosecutor's] mistakes were 'unimaginable.'" **Johnson**, 231 A.3d at 827. The Court opined that this description was

strongly suggestive of a reckless disregard for consequences and for the very real possibility of harm stemming from the lack of thoroughness in preparing for a first-degree murder trial. There is little dispute that those consequences include "prejudice [to] the defendant to the point of the denial of a fair trial." That being the case, Article I, Section 10 immunizes [the defendant] from being put in jeopardy a second time for the crimes with which he was charged in connection with the killing of [the victim].

*Id.* at 827-28 (citations and footnote omitted).

With this background in mind, we review Appellant's claims on appeal. Appellant first argues the trial court erred and abused its discretion when it found ADA Jaramillo's conduct — in displaying a previously suppressed firearm to the jury — was "an inadvertent mistake." Appellant's Brief at 16. Rather, Appellant describes the ADA's actions as "flaunt[ing] two guns before the jury in complete disregard of the admonitions of defense counsel and the court." *Id.* at 17. Indeed, he maintains: "The very act of bringing two guns into the courtroom . . . suggests that this was not a mere mistake, and instead was an act of intentionally defying the orders of the trial court and [the Superior] Court." *Id.* Appellant emphasizes the Commonwealth's closing argument in his first trial, which attempted to paint him "a big-time drug dealer" from the streets who was "capable of committing the assault on the officers." *Id.* at 18. Accordingly, he insists the Commonwealth's misconduct "met the standards . . . for intentional prosecutorial overreaching that was designed to prejudice a fair trial, and retrial should be barred." *Id.* at 23.

In his second argument, Appellant contends that, even if we conclude "the Commonwealth's misconduct was not conscious and calculated, [we]

should . . . find that such deliberate indifference to the preparation and presentation of evidence . . . is nonetheless reckless [such that it constitutes] prosecutorial overreaching meriting a double jeopardy bar of retrial." Appellant's Brief at 24. Relying on *Johnson*, Appellant insists that ADA Jaramillo's "conscious decision to bring both guns into the courtroom" demonstrated either a deliberate attempt to portray Appellant as a dangerous individual or "evidenced deliberate indifference in the preparation of his case and to the trial court's order regarding the inadmissibility of trial evidence." *Id.* at 29. He maintains "[e]ither way, a retrial should be barred." *Id.*

Upon our review of the record, the parties' briefs, and the relevant statutory and case law, we conclude the trial court thoroughly addressed and properly disposed of Appellant's claims in its May 24, 2021, opinion. *See* Trial Ct. Op. at 15-22 (discussing case law concerning double jeopardy protections, including recent cases applying the *Johnson* standard, and finding "no resemblance between this case and that described by our Supreme Court in *Johnson*[ — ]" finding that, in the present case, "an experienced prosecutor made a mistake [and] picked up the wrong gun[;] "there was "no overreaching[,] recklessness[, or] attempt to disadvantage [A]ppellant or compel him to seek a mistrial[;]" Appellant's "identification was not in doubt, only his intent[;]" and that the "Commonwealth's errors in this case were negligent rather than reckless or intentional"). Our review reveals the trial court's factual findings are supported by the record, and its legal conclusion

are correct; thus, we rest on its well-reasoned bases.  ***See Sanchez***, 262 A.3d at 1288.

We direct that a copy of the trial court's May 24, 2021, opinion be filed along with this memorandum, and attached to any future filings of this memorandum.

Orders affirmed.  Case remanded for further proceedings.  Jurisdiction relinquished.

*Judgment Entered.*

*Joseph D. Seletyn, Esq.*
*Prothonotary*

Date: *4/25/2022*

IN THE COURT OF COMMON PLEAS OF PHILADELPHIA COUNTY
FIRST JUDICIAL DISTRICT OF PENNSYLVANIA
TRIAL DIVISION – CRIMINAL SECTION

| | | |
|---|---|---|
| Commonwealth of Pennsylvania | : | CP-51-CR-0011169-2013 |
| | | CP-51-CR-0011170-2013 |
| | : | CP-51-CR-0011171-2013 |
| v. | | CP-51-CR-0011172-2013 |
| | : | CP-51-CR-0011173-2013 |
| | | |
| | | Superior Court Docket Nos.: |
| Eric Torres | : | No. 66 EDA 2020 |
| | | No. 67 EDA 2020 |
| | : | No. 68 EDA 2020 |
| | | No. 69 EDA 2020 |
| | : | No. 70 EDA 2020 |

**FILED**

OPINION

MAY 24 2021

Office of Judicial Records
Appeals/Post Trial

Ehrlich, J.

Eric Torres, hereinafter Appellant, appeals from this Court's October 17, 2019 Order denying his Petition to Bar Prosecution as a Violation of Double Jeopardy.[1] In light of this ruling, on October 21, 2019, appellant filed Petitions for Review of a Double Jeopardy Frivolous Determination and Request for Expedited Stay of Retrial.[2] On January 7, 2020, our Superior Court Granted appellant's request and Ordered these matters consolidated and to proceed as appeals from this Trial Court's Order of October 17, 2019.[3]

---

[1] See Notes of Testimony, 10/17/2019, Argument and Ruling on Appellant's Petition to Bar Prosecution as a Violation of Double-Jeopardy.

[2] Pursuant to Pa. R.Crim.P. 587 this Court made a specific finding that appellant's Petition to Bar Prosecution as a Violation of Double-Jeopardy was frivolous. These Petitions for Review were docketed with our Superior Court under Nos. 139-143 EDM 2019.

[3] Appellant's Petitions for Review were then transferred to 66-70 EDA 2020 as appeals.

## FACTUAL AND PROCEDURAL BACKGROUND

Appellant was originally tried before a jury in late February and early March of 2015, and on March 10, 2015, was found guilty of aggravated assault, simple assault, assault of a law enforcement officer, possession of an instrument of crime, multiple firearms offenses, possession with the intent to deliver, and possession of drug paraphernalia.[4] The charges stemmed from a series of events on August 13, 2013, including the eventual shooting of Philadelphia Police Officer Edward Davies. Appellant was sentenced on July 8, 2015, to an aggregate term of sixty-six (66) to one hundred thirty-two (132) years' incarceration. The following testimony and evidence were introduced during appellant's initial 2015 trial:

"On August 13, 2013, Officer William Barr of the Philadelphia Police Department was assigned to street patrol in a marked vehicle in the area of Fifth Street and Allegheny Avenue. Notes of Testimony ("N.T."), 02/25/2015, at 44–45. Just before noon, Officer Barr initiated a traffic stop on a BMW, Pennsylvania license plate number JJA-951, travelling eastbound on Allegheny. *Id.* at 45. Officer Barr had been traveling behind the vehicle and initiated the stop when he saw the middle brake light was not functioning. *Id.* at 46. The vehicle pulled over on Fifth Street, just North of Allegheny. *Id.* Officer Barr exited his patrol car and approached the vehicle, which was being driven by Appellant. *Id.* at 47. As he approached, he noticed Appellant's shoulders moving back and forth. *Id.* at 47–48.

Officer Barr explained that he had stopped Appellant for the brake light, as well as his inspection stickers, which were from New York but placed on a Pennsylvania license plate. *Id.* at 48. He asked for Appellant's license and registration. *Id.* Officer Barr testified that Appellant produced the documents right away, but that he appeared nervous and was looking around. *Id.* at 49. Officer Barr asked Appellant if there was anything in the vehicle he should know about, but Appellant did not answer. *Id.* This made Officer Barr concerned for his safety, and he opened the door and asked Appellant to step out of the vehicle. *Id.* at 50. Appellant did not exit the vehicle; instead he closed the door and drove away. *Id.* Officer Barr returned to his own vehicle to follow him. *Id.* at 51. He still had Appellant's license and registration in his hand at this time. *Id.*

Officer Barr followed Appellant on Fifth Street for about five or six blocks. *Id.* at 52. Officer Barr relayed information about Appellant's flight over the radio. *Id.* at 53. Sergeant Zimmerman then directed Officer Barr to terminate his pursuit due to safety concerns, as both vehicles were traveling at high speeds in a residential area. *Id.* Within a few minutes, Sergeant Zimmerman met Officer Barr at Fifth and Sedgley Avenue to sign his log. *Id.* at 54–55. At about this time, Officer Barr also received information over the radio about a crash and a disturbance at a grocery store at Fourth and Annsbury Streets. *Id.* at 55–56. Officer Barr then traveled to the grocery store. *Id.* at 56.

---

[4] 18 Pa.C.S.A. §§ 2702(a), 2701(a), 2702.1(a), 907(a), 6105(a)(1), 6106(a)(1), 6108, and 35 Pa.C.S.A. §§ 780-113(a)(30) and (a)(32) respectively.

Officer Roberto Luciano was also on duty in the same neighborhood on August 13 and received the call about a vehicle that had fled a stop. N.T., 02/27/2015, at 65–66. Officer Luciano traveled to Second and Erie to attempt to intercept the vehicle. *Id.* at 66. While waiting at that intersection, a 911 call reported a similar vehicle involved in an accident at Second and Bristol streets. *Id.* Upon arriving at the scene, Officer Luciano observed a light-colored BMW crashed against a fence and building. *Id.* at 66–67. The building was owned by the Richard Burns Company, a construction material recycling facility. N.T., 03/02/2015, at 37–38. Allen Burns, the owner of the company, was in the parking lot when he heard a screeching and "bang" of the car hitting the building. *Id.* at 38. Mr. Burns saw the man in the driver's seat, later identified as Appellant, push the airbag away and climb out of the driver's side window. *Id.* at 39. Mr. Burns watched Appellant take a step or two, then turn back and reach inside the vehicle. *Id.* He then began running from the car as he was putting something dark in his pocket. *Id.* at 41–42. When Officer Luciano arrived on the scene soon after, he reported over the radio that the vehicle was unattended, and the driver had fled. N.T., 02/27/2015, at 67–68.

Upon hearing the information broadcast by Officer Barr, Officers Van Sciver and Ortiz drove to 401 West Raymond Street to see if Appellant returned to his residence. N.T., 03/02/2015, at 64–65. While waiting outside the residence, they received more information from Officer Luciano regarding the crash at Mr. Burns' building. *Id.* at 68–69. Officers Van Sciver and Ortiz began traveling toward Third and Wingohocking Streets, hoping to intercept Appellant. *Id.* at 69. Officer Van Sciver testified that they were then approached by an unidentified man, who told them a man had just run into the corner grocery store at Fourth and Annsbury Streets. *Id.* at 69–70. Upon entering the store, they saw Appellant running down an aisle toward a back-access door and gave chase. *Id.* at 73–75. Officer Van Sciver grabbed Appellant at the steps by the door and testified that Appellant resisted and kept his hands at his waistband. *Id.* at 82.

Officers John Bucceroni and Edward Davies were in a marked police car in the area of Fourth and Annsbury when they received the radio calls regarding Appellant that day. N.T., 02/26/2015, at 28–29. They arrived at the Almonte Grocery store within a few minutes of receiving the call. *Id.* at 29. Officer Bucceroni testified that Officer Davies entered the store first. *Id.* at 30. Officers Van Sciver and Ortiz were already on the scene, and Officer Bucceroni saw them struggling with Appellant at the back of the store. *Id.* at 31–32. Appellant appeared to be on his knees or bending over, and both hands were at his waist. *Id.* at 33. The officers were trying to hold Appellant's arms. *Id.* They were instructing Appellant, in both English and Spanish, to show his hands. *Id.* at 34.

Officer Bucceroni testified that as Appellant struggled, he and Officers Van Sciver, Davies, and Ortiz were all attempting to get him under control. *Id.* at 39. They continued to say "dame los manos" and "give me your hands." *Id.* at 41. Officer Bucceroni reached for Appellant's hands and felt a metal object he recognized as the barrel of a gun. *Id.* He said "gun" to alert his fellow officers, and a few seconds later a shot was fired. *Id.* at 44. He heard Officer Davies react, but did not see him, because Appellant was still struggling. *Id.* at 46–47.

Officer Shawntai Cooper had arrived on the scene with her partner, Officer Kendall Robinson, when the other four officers were already struggling with Appellant. N.T., 02/27/2015, at 30–33. In the course of the struggle, she saw a muzzle flash and heard a "pop" sound. *Id.* at 40. Officer Davies said, "I'm shot" and grabbed his abdomen. *Id.* at 42. He stumbled towards Officer Cooper and fell into her arms. *Id.* With the help of Officer Barr, Officer Cooper put Officer Davies into a car and drove him to Temple University hospital. *Id.* at 45–46.

After Officer Davies was shot, Officer Bucceroni told Appellant to give him the gun, but Appellant continued to kick and struggle against the officers. N.T., 02/26/2015, at 47–48. When Officer Bucceroni grabbed for the gun again, Appellant bit his wrist. *Id.* at 48. When he tried to pull the gun away a second time, Appellant bit him again and drew blood. *Id.* at 51. Officer Bucceroni was eventually able to get the gun from Appellant and hand it to Officer Ortiz. *Id.* at 52. Appellant continued to struggle, but officers were then able to handcuff him. *Id.* They attempted to escort Appellant from the store, but he continued to resist. *Id.* As the officers brought Appellant to a marked police car, he kicked, and attempted to bite and head-butt the officers. *Id.* at 53.

Following his arrest, Officer Luciano requested Appellant be brought back to the scene of the accident, so that Mr. Burns could identify him as the man who fled from the car crash. N.T., 02/27/2015, at 71. Appellant was brought to the scene of the accident in a police vehicle, and Officer Luciano observed him screaming and banging his head on the Plexiglas divider and on the back of the seat. *Id.* at 72–73. Appellant was saying that if the officers took the handcuffs off, he would fight with them. *Id.* at 73. They removed Appellant from the vehicle, and he began swinging his arms trying to reach his waistband, with his hands still cuffed behind his back. *Id.* at 73–74. Mr. Burns was able to positively identify Appellant as the man who had fled the scene of the accident on his property. *Id.* at 74. Before returning Appellant to the vehicle, he was patted down in the waistband area he had been reaching for, and a black holster was found clipped to his belt. *Id.* at 74–75.

Appellant was then taken to Einstein Medical Center's emergency department. N.T., 02/26/2015, at 125. Dr. Neeraj Gupta attempted to assess any injuries following the car accident and struggle with police, but Appellant was uncooperative. *Id.* at 126. Several people were required to hold Appellant down on a stretcher, and eventually leg and arm restraints were deemed necessary. *Id.* at 127. Even after applying restraints to Appellant, he continued to fight and was still able to sit up. *Id.* at 128. Dr. Gupta became concerned about this behavior, which included biting and spitting, and administered a sedative to calm Appellant. *Id.* After obtaining vital signs and as much other information as he could from Appellant, Dr. Gupta concluded that he appeared to be intoxicated, likely due to an illegal substance. *Id.* at 133–34. Appellant was discharged from the hospital the next day, August 14. *Id.* at 141.

Officer Edward Davies testified that he had been trying to help other officers restrain Appellant when he heard a bang. N.T., 03/02/2015, at 21–22. He said he felt his chest and stomach get "real hot" and saw a hole in his shirt. *Id.* at 22. He testified that everything was hazy, and he remembered staggering towards the floor. *Id.* at 24. When Officer Cooper drove him to the hospital, he recalled her telling him to keep his eyes open and stay awake. *Id.* at 25.

Officer Davies testified that he spent 37 days in the hospital and was in a medically induced coma for three weeks. *Id.* at 26. It was several months before he was able to walk normally again. *Id.* at 27. At the time of trial, he had five surgeries to address his injuries, and was told he would need at least one more surgery following trial. *Id.* At the time of trial, Officer Davies was undergoing rehabilitation and aquatic therapy three times a week. *Id.* at 28. He continued to feel constant pain in his stomach, back, groin, and right leg and foot. *Id.* He testified that he was unable to lift or play with his three-year-old son due to his injuries. *Id.* Officer Davies also lost a kidney due to the shooting. *Id.* at 29.

Detective Frank Mullen, assigned to the Homicide Unit, assisted in obtaining video surveillance footage from the Beer Stop beer distributor located at 4245 Rising Sun Avenue. N.T., 02/27/2015, at 109. The distributor had multiple surveillance cameras on its property, and Detective Mullen was able to obtain footage from August 13 that showed the Richard Burns Company's property. *Id.* at 111–12. The footage showed Appellant's BMW crash into the fence and building around noon. *Id.* at 114.

Officer Brian Myers was assigned to the Narcotics Field Unit at the time of the incident. N.T., 03/04/2015, at 98. On August 13, 2013, he was sent to execute a search warrant at Appellant's home at 401 West Raymond Street. *Id.* at 99. From the house, Officer Myers recovered a white rectangular object known as a rack of heroin, boxes of blue and white glassine baggies, and a grinder. *Id.* at 102–03. Multiple packs of marijuana and bulk heroin were also found. *Id.* at 104.

Officer Steven Berardi of the Crime Scene Unit was assigned to process two vehicles registered to Appellant at the police garage on McCallister Street on August 14, 2013. N.T., 03/03/2015, at 184–87. These vehicles were a silver BMW, license plate JJA9851, and a black Lexus, license plate JCT4539, both registered to Appellant. *Id.* at 186–87. Officer Berardi photographed the exterior and interior of each vehicle, and these photographs were entered into evidence. *Id.* at 187–88.

Inside the BMW was a Samsung phone with a black and red case on the passenger side floor. *Id.* at 188. In the glove compartment were four empty "green plastic screw cap jars," which Officer Berardi testified are often used to package marijuana. *Id.* at 188–89. There was also a bundle of blue glassine packets (approximately 12 packets) stamped "eBay," containing an off-white powder, later tested and

-4-

determined to be heroin. *Id.* at 189. Officer Berardi also found a fanny pack containing multiple bundles of white and blue glassine packets containing an off-white powder. *Id.* at 191. In another pocket of the fanny pack were two more bundles of white glassine packets containing off-white powder. *Id.* More white glassine packets were found inside a red sunglass pouch containing off-white powder, stamped "Lexus." *Id.* at 192–93. In total, Officer Berardi recovered 153 glassine packets containing off-white powder from the BMW; 22 blue packets stamped "eBay" and 131 white packets stamped "Lexus." *Id.* at 194–95. No contraband was found inside the Lexus registered to Appellant. *Id.* at 199.

Officer Kevin Keyes of the Narcotics Field Unit gave expert testimony at trial. *Id.* at 173. Officer Keyes reviewed the chemical analysis of the property retrieved from Appellant's home and vehicles. *Id.* at 178. Officer Keyes testified that in his expert opinion, the drugs found in this investigation were possessed with the intent to distribute. *Id.* at 179. Officer Keyes based this determination on the amount of packets and the bulk amount of heroin possessed, which would amount to over 800 packets total based on his estimates. *Id.* at 179–80. The grinder and strainer found in the house are also often used in processing kilos of heroin to a fine powder. *Id.* at 182. Officer Keyes further explained that the toothbrush found with powder residue was commonly used to keep buildup off the grinder, and the cards and straw were used to portion out the powder into individual packets. *Id.* at 183–84."[5]

Appellant appealed his conviction and sentencing on several grounds, including this Court's denial of his Motions to Suppress evidence found during a search of his vehicle and his house. The search of his home produced a 9 mm Zoraki model gun, as well as drugs and drug paraphernal, all of which were introduced into evidence at trial. Regarding the search of his home, appellant contended: "The lower court erred in denying [Appellant's] motion to suppress physical evidence,…as search warrant 176023 failed to demonstrate probable cause within the four corners of the warrant to search [Appellant's] house when an alleged crime was committed on the streets of Philadelphia, with no nexus to the house."[6]

On appeal, our Superior Court, although finding that this Court properly denied appellant's Motion to Suppress items found in appellants car, ruled that this Court erred in denying appellant's Motion to Suppress items found in appellant's home, opining that "appellant's identification was not in doubt, and the police were already in possessing of the firearm used in the shooting…There is no nexus between the crimes under investigation and the

---

[5] Commonwealth v. Torres, 1925(a) opinion, Judge Charles A. Ehrlich, 4/22/2016, pp. 2-9.
[6] See Appellant's Pa.R.A.P. 1925(b) Statement dated 8/11/2015.

proposed search."[7] Our Superior Court therefore remanded this matter back to this Trial Court with the instructions that "a new trial will be required without the introduction of the evidence retrieved from Appellant's home."[8]

On August 22, 2019, this Court conducted a pre-trial hearing wherein it was agreed by counsel for the Commonwealth that appellant's Motion in Limine to preclude all items seized during the search of his home would be granted pursuant to the ruling of our Superior Court.[9] On September 10, 2019, jury selection began with appellant's re-trial commencing in the afternoon of September 11, 2019. Prior to trial commencing that day, this Court and all counsel agreed that despite the fact that the Commonwealth's trial exhibit list included items seized from appellant's home, precluded exhibits such as those items would not be used at trial. Further, this Court gave the admonition to counsel that "things that don't come in, don't come in. I don't care what's marked as exhibits."[10] By the following afternoon, the Commonwealth had completed the testimony of their first witness, Philadelphia Police Officer, William Barr, and had begun their direct examination of their second witness, Philadelphia Police Officer, Raul Ortiz.

Officer Ortiz testified as to the events that led up to the shooting of Officer Davies, including his and other officers struggle to disarm the appellant of the firearm used in the shooting. The Notes of Testimony reflect that during this examination, Assistant District Attorney, Edward Jaramillo, Esquire, who had also represented the Commonwealth during appellant's first trial, approached Officer Ortiz and showed him a gun and asked the officer if he recognized it as the same gun that he had picked up from the floor following the struggle to

---

[7] Commonwealth v. Torres, 2241 EDA 2015 at p. 18.
[8] Commonwealth v. Torres, 2241 EDA 2015 at p. 23.
[9] See N.T. 8/22/2019, pp. 29-30.
[10] See N.T. (excerpt) 9/11/2019, p. 5.

- 6 -

disarm the appellant. At this point, Officer Ortiz asked this Court if he could stand to display for the jury how to identify a gun that is "jammed.' The following then occurred:

> **OFFICER ORTIZ: When I picked up—may I stand**
> **THE COURT: Sure**
> **MR. JARAMILLO: (Incoherent)**
> **OFFICER ORTIZ: I was wondering**
> **MR. JARAMILLO: No wonder you were looking funny at us.**
> **OFFICER ORTIZ: Yeah**
> **MR. STRANGE: (APPELLANT'S COUNSEL): Objection. Can we see you in the back, please, Your Honor?**

N.T. 9/12/2019, pp. 84-85

At this point, this Court, after having a conversation with counsel in his robing room, dismissed the jury and a discussion ensued on the record with all counsel, during which appellant's counsel made an oral motion for a mistrial. *Id.* p. 87. Although there were some disagreement between appellant's trial counsel and counsel for the Commonwealth as to what occurred during the examination of Officer Ortiz, all counsel agreed to the following as to what had transpired. ADA Jaramillo first approached Officer Ortiz with the silver Zoraki model gun found in appellant's home which was banned from introduction by our Superior Court. ADA Jaramillo then went back to counsel table and switched the silver Zoraki firearm for a black .45 Glock firearm which was confiscated from the appellant at the store following the shooting of Officer Davies. This gun was then shown to Officer Ortiz who was about to describe for the jury how it gets jammed when court was halted, and the jury eventually dismissed. Counsel agreed that both guns were located and removed from the same box at the Commonwealth's counsel table during the examination of Officer Ortiz. *Id.* at pp. 87-106.

During this discussion with all counsel, appellant's counsel made a formal request that this Court grant appellant' request for a mistrial and that it be entered with prejudice. *Id.* p. 100. The Commonwealth opposed this request and suggested that a curative instruction be given to

- 7 -

the jury. *Id.* at p. 104. Following the arguments of counsel, this Court granted appellant's request for a mistrial, but did so without prejudice. In doing so, this Court stated the following;

> **In this case the gun was shown to Officer Ortiz. The gun is a silver gun. It was taken from defendant's house. The Superior Court overturned the previous conviction because the Superior Court ruled that the evidence in the house should not have been allowed in and was so prejudicial as to warrant the overturning of the verdict. So, the case came back for a second trial because of that.**
>
> **As a result of that decision and as a result of what occurred today, what I find is that there was an error made by the prosecution, an inadvertent error of taking the wrong gun and showing it to the officer. However, by doing that, the gun...from Raymond Street is now in front of the jury. And while I could give a curative instruction to the jury to say disregard it, they have seen two guns. And since that gun, specifically from Raymond Street can't come in, the only gun that's coming in is the gun the only ballistic evidence that's coming in, is the gun that was taken from the defendant after he allegedly shot Officer Davies, which he is now on trial for. No other ballistics evidence is coming in.**
>
> **So in view of that, and in view of the fact that we have really just started the trial, I believe in the interest of making sure that the record is completely clean, and that there are no issues about multiple weapons, and the issues of what the defense can do or not do in terms of a proper defense for Mr. Torres, I'm going to have to declare a mistrial. But I am not finding that this was intentional.**
>
> **...**
>
> **There was no reason to think that this was not an inadvertent error, especially after the case had just started, one officer was testifying about identifying this [gun]. And I think a curative instruction could certainly help, but in an abundance of caution to make sure there's no issues and the defendant gets fair trial, which is what he is entitled to as any other defendant is, I am going to declare a mistrial. But I am not finding that double-jeopardy is in any way implicated.**

*Id.* at pp. 107-109.

Thereafter, on October 9, 2019, appellant filed a Petition to Bar Prosecution as a Violation of Double Jeopardy. On October 17, 2019, a hearing was held before this Court on appellant's petition. At this hearing, appellant, relying upon the 6th and 14th Amendments of the United States Constitution and Article 1, Section 10 of our Pennsylvania Constitution as well as our Pennsylvania Supreme Court decisions in *Commonwealth v. Smith*, 615 A.2d 321, 532 Pa. 177 (Pa. 1992) and *Commonwealth v. Martorano*, 741 A.2d 1221, 559 Pa. 533 (Pa. 1999) and

- 8 -

United States Supreme Court decision in *Oregon v. Kennedy*, 456 U.S. 667 (1982), requested that this Court grant his motion to bar prosecution on the grounds of double jeopardy. N.T. 10/17/2019, pp. 3-4.

In support of his request, appellant contended that the prosecutor made "intentional choices" that led to the wrong gun being shown to the jury. Specifically, appellant detailed these intentional choices at the hearing as follows;

(1) Both guns (the silver Zoraki model gun found during the search of appellant's home ruled inadmissible by our Superior Court and the admissible black .45 Glock model gun used in the shooting of Officer Davies) were brought into the courtroom on the day trial began;

(2) Both guns were placed on the Commonwealth's exhibit list;

(3) Both guns were 'cleared' in the courtroom by the sheriff at the request of the Commonwealth;

(4) Both guns were in an open box on the Commonwealth's counsel table in view of the jury; and,

(5) Both guns were presented to the jury. N.T. 10/17/2019, pp. 7-8.

In response, ADA Jaramillo stated repeatedly that this was an "honest mistake.' He stated that although both guns have separate D.C. (District Control) numbers, both guns were brought into the courtroom that day because they remained stored in the same singular evidence box as they had been during appellant's first trial. ADA Jaramillo stated that although he didn't personally have both guns cleared by the sheriff that day, he assumes that his co-counsel, Mr. Shuiayb, may have had both guns cleared, including the suppressed gun even though it was their intention to only remove and display to the jury the one admissible black .45 Glock firearm. ADA Jaramillo denied that the guns were left on counsel table so that they could be on display for the jury.

- 9 -

ADA Jaramillo further stated that "I picked up the wrong gun. I took the wrong gun up there. And that was my mistake. And it was an honest mistake. One that I realized only a little—just a little late, but there was no intention to use both guns." *Id.*, p.11. ADA Jaramillo added that "..anybody that knows me—tried many a case, that would think that I would intentionally damage this case or have this case come back or do anything—there was never a question asked of this officer [Ortiz] that relate to anything back in 401 W. Raymond [appellant's home]. That was not done..." *Id.*

This Court then made the following findings on the record:

**All right. What I find is ...Officer Ortiz was testifying. And he testified about the radio call which brought him to the scene which ultimately got him to the Almonte Mini-Mart. And he described the struggle inside the Almonte Mini-Mart as he and others were trying to disarm the defendant. Actually, if I'm correct, I think he got on the floor at some point and he tried to show the jurors what he and other officers were doing as they were trying to get to the defendant's hand where they believe he had a gun in his waistband. And the officer also got, I quite emotional as he testified describing how he didn't know whether they could disarm him he was so strong. And testifying about how it seemed like an eternity. And there were some tears in his eyes as he testified. And he was testifying, I will describe it as very effectively. It was only on direct exam, cross had not started, about what exactly had occurred, which is the crux of this case in the Almonte Mini-Mart that day when Officer Davies was shot.**

**And after he got done showing how they were trying to disarm the defendant, ADA, assistant district attorney Ed Jaramillo showed Officer Ortiz what he believed to be the gun that was ultimately recovered from the defendant. He showed it to the officer. The officer looked at him -- according to the notes, and I remember this -- sort of stared at him at which point ADA Jaramillo realized that it was the wrong gun, went back to the table. That gun that was initially shown was the gun that was taken from the defendant's house which was suppressed. As a result of this, counsel objected.**

**We went in the back, and subsequently had a hearing on declaring a mistrial which was requested by defense counsel which I did grant. And when I granted it I stated at that time, and I'm going to restate today, that I don't think it was done in any way deliberately, but I wanted to make sure that Mr. Torres had a fair trial, and there was no issues at all. So that we were one day or day and a half into testimony, we would pick a new jury and start the case over, so there would be no issue about the guns being shown -- wrong gun being shown to an officer in front of a jury. And I**

heard the case the first time. And I heard it again this time. And I can say that the way it was coming in at that point, there was absolutely no reason for the Commonwealth to take and try to show a gun that was suppressed.

It was, I believe, an honest mistake. A mistake that maybe could have been avoided if the evidence had been taken out of the box and put on another property receipt; or maybe if the gun had been taken out of that box before being shown, and the rest of the box put away. Counsel cites the classic cases of *Commonwealth v. Martorano*, 559 PA 533, a 1999 case, and which builds on *Commonwealth v. Jay Smith* which is a 1992 case, 532 PA 177. And in those cases the Pennsylvania Supreme Court barred retrial. But they were very clear in why they barred retrial. They barred it because -- and they talk about, well, starting with the Smith case, that had to do with evidence that was withheld from the defense. And it basically came down to intentional prosecutorial misconduct designed to secure conviction through the concealment of exculpatory evidence as the Smith case says. And that involved grains of sand on the decedent's toes which would indicate that the decedent was killed in Cape May, New Jersey, versus in Pennsylvania which was a defense in this case. And the Court ruled that because this evidence was concealed, that there was prosecutorial tactics, they called it egregious prosecutorial tactics. In fact, they said it would be hard to imagine more egregious prosecutorial tactics. They ruled that Jay Smith could not be retried.

In the case of Commonwealth versus Martorano, in that case, the issue raised by the Supreme Court said that the conduct there meets the Smith standard. Bad faith, deliberate concealment of evidence, intentional conduct as the Court describes it. And there, the case talks about how the prosecutor in that case acted in bad faith throughout the trial, consistently making reference to evidence that the trial Court had ruled inadmissible, defined the Court's rulings on objections, and in a tactic that could only described be as "Machiavellian" repeatedly insisting that there was fingerprint evidence linking the appellees to the crime when there was no, in fact, such evidence. This is precisely as the Court wrote, it does not involve concealment of evidence, but it involves the type of conduct, prosecutorial overreaching, to which double jeopardy applies. And these two cases I think are the seminal cases in Pennsylvania, there's a more recent case that quotes it, which is Commonwealth versus Robertson, which is not a published opinion, 2014, which goes through the same thing about "intentional actions by the prosecutor."

The reason I'm citing these cases and having reviewed the case law extensively in view of counsels' motion and notes of testimony is because as I said previously, I don't believe that this was done intentionally by the prosecution. It maybe could have been avoided. It was a mistake. Mistakes happen. Unfortunately, this was a mistake that caused me to declare a mistrial. And a curative instruction would not have been appropriate, I felt. And frankly, we were also a day or so into the trial. But I do not find from watching Mr. Jaramillo as he examined Officer Ortiz that he deliberately wanted to take the gun that was suppressed and show it to Officer Ortiz. He wanted to show him the gun that was with the defendant when Officer Ortiz was testifying

- 11 -

about trying to disarm the defendant in the Almonte Mini-Mart. That's a mistake. That's not intentionally provoking a mistrial. That's not something that was done in bad faith.

In fact, it was counterproductive to the D.A. I don't think that Mr. Jaramillo wanted to have an officer, from my observations of Officer Ortiz, who was testifying quite well on direct, be shown the wrong gun, and have basically his testimony have to start over. And I say all of this because while it's true that other precautions may have been taken before to prevent it, that's different when mistakes are made inadvertently, not intentionally. Double jeopardy bars when a prosecutor does conduct that is egregious. That tries to block a fair trial for a defendant. Withholds evidence. Ignores rulings of a judge so that improper information is brought to a jury. That's what Jay Smith and that's what Mortorano and Daidone talk about. That's what they talk about. And that's appropriate. Because that kind of conduct has to be sanctioned. And the ultimate sanction is that the defendant doesn't have to stand trial again. I don't think in any way that kind of conduct happened here. I saw the whole thing. I do not believe that it was intentional in any way.

.........

I am the observer, and I am finding that it was not intentional. And that it was inadvertent, an inadvertent mistake of showing the wrong gun, a gun that should not have been shown to the officer that was not even appropriate at that point to be shown. Why the guns were here together? Well, they are put on property receipts, they're put in boxes together, perhaps they can be re-marked and new property receipts can be done. Hindsight in life is 2020. And I don't think that hindsight and doing things differently or better means that things were done intentionally to cause a mistrial in this case. So, based on what I've said, and based on what I believe the law calls for, I do not think that this was intentional.

And I am going to deny the defense motion to bar retrial under double jeopardy grounds based on the notes of testimony which I incorporate, based on my observations, of watching this all unfold before me, and based on hearing from counsel both that day on September 12 and subsequently today. Now, I believe that under the rules, and I think it's Rule 587, I have to advise - although, I'm sure counsel knows this very well, but just so there's no issue later on that I've made a finding, Mr. Torres, that this motion is frivolous. And I've explained why. I don't believe it was done deliberately. I believe it was done inadvertently and for all the reasons I've just described. *Id.*, pp. 12-20.

This Court then denied appellant's Petition to Bar Prosecution as a Violation of Double-Jeopardy, and, pursuant to Pa. R.C.P. 587 (B)(5) made an additional finding that the petition was

- 12 -

of "frivolous" and accordingly advised the appellant of his right to file a Petition for Review of this determination pursuant to Pa. R.A.P. within thirty (30) days.[11]

On October 21, 2019, appellant filed Petitions for Review of a Double Jeopardy Frivolous Determination and Request for Expedited Stay of Retrial.

While appellant's Petitions for Review were pending in our Superior Court, this Court, after seeking the guidance of the Chief Law Clerk for Eastern District of our Superior Court, as to the possibility of the matter being stayed pending review, rescheduled this matter for trial. Jury selection began on October 29, 2019 and trial began on October 30, 2019. On the second day of trial it was brought to the attention of this Court that several members of the jury had improperly began discussions about the case, including possible witnesses and that it was being re-tried. N.T. 11/31/2019. Given the jury's failure to follow the specific instructions and admonitions given by this Court at the outset of trial, this Court granted the appellant's request for a mistrial. *Id.* pp. 38-39. The Court then rescheduled appellant's trial for March 23, 2020.

Thereafter, on November 18, 2019, appellant filed a "Petition to Amend Review of a Double Jeopardy Frivolous Determination and Application for an Expedited Stay of Retrial

---

[11] Pa. R. Crim. P. 587- Motion for Dismissal
(B) Double Jeopardy
(1) A motion to dismiss on double jeopardy grounds shall state specifically and with particularity the basis for the claim of double jeopardy and the facts that support the claim.
(2) A hearing on the motion shall be scheduled in accordance with Rule 577 (Procedures Following Filing of Motion). The hearing shall be conducted on the record in open court.
(3) At the conclusion of the hearing, the judge shall enter on the record a statement of findings of fact and conclusions of law and shall issue an order granting or denying the motion.
(4) In a case in which the judge denies the motion, the findings of fact shall include a specific finding as to frivolousness.
(5) If the judge makes a finding that the motion is frivolous, the judge shall advise the defendant on the record that a defendant has a right to file a petition for review of that determination pursuant to Rule of Appellate Procedure 1573 within 30 days of the order denying the motion.
(6) If the judge denies the motion but does not find it frivolous, the judge shall advise the defendant on the record that the denial is immediately appealable as a collateral order.

(Update-Amendment to the Double-Jeopardy Motion and New Trial Date of March 23, 2019 [sic]." On January 7, 2020, our Superior Court Granted appellant's request and Ordered these matters consolidated and to proceed as appeals from this Trial Court's Order of October 17, 2019.[12]

On January 14, 2020, this Court entered an order pursuant to Pa. R.A.P. 1925(b) directing appellant to file his Statement of Errors Complained of on appeal which was timely filed by appellant. On appeal, appellant contends the following errors which are set forth herein verbatim:

1. As a re-prosecution would violate the United States and Pennsylvania constitutions prohibitions against double-jeopardy, Mr. Torres moves to bar his prosecution. Oregon v. Kennedy, 456 U.S. 667 91982) held that the Federal prohibition against double-jeopardy prohibits re-prosecution if the prosecution's intent was to provoke a mistrial. U.S. CONST., Amend. V, XIV. The Pennsylvania Supreme Court has held that the Pennsylvania Constitution's double-jeopardy protection is broader than the federal standard and is violated if the prosecutor intended to prejudice a defendant to the point of denial of a fair trial. Commonwealth v. Smith, 532 Pa. 177, 615 A.2d 321 (1992), Commonwealth v. Martorano, 559 Pa. 533, 741 A.2d 1221 (1999); PA>CONST., Art. I, Sec. 10. These standards are met by the prosecutor here. The choices and actions of the prosecutor demonstrate that he acted intentionally to deny Mr. Torres a fair trial. The Superior Court ruled that the silver 9mm Zoraki model gun was inadmissible at trial. Then, when defense counsel argued motions in limine before this second trial, the trial court again made clear to the Commonwealth that the silver Zoraki model gun would not be admissible. The Commonwealth flouted the Superior Court's findings and the trial court's very clear rulings by intentionally choosing to bring two guns into the courtroom. The Commonwealth went even further by intentionally choosing to have both guns "cleared" by the sheriff assigned to the courtroom (thus knowing that both guns were in the box), and then went on to intentionally open an evidence box with two guns on the Commonwealth table, which is immediately next to the jury box, intentionally allowing the guns to be in view of the jurors. Then, the prosecutor picked up the suppressed gun, announced that he had it cleared, and presented it to a witness and the jury. Further, he then intentionally picked up the .45 caliber Glock, announced that it was also cleared by the sheriff and continued to present a second gun to the jury, intentionally allowing the jury to see two guns. When defense counsel objected, and all the parties went into the robing room, the prosecutor chose to leave both guns on the witness stand, allowing for the jury to see two guns for a few minutes before the jury's dismissal for lunch. The overt act of bringing two guns into the courtroom and clearing two guns with the sheriff,

---

[12] Appellant's Petitions for Review were then transferred to 66-70 EDA 2020 as appeals.

- 14 -

including the suppressed gun, suggests that this was not a mere mistake and instead was an act of intentionally defying the orders of the trial court and Superior Court.

2. Should this Court find that the Commonwealth's misconduct was not conscious and calculated, it should nonetheless find that such deliberate indifference to the preparation and presentation of trial (given the numerous notices and warnings it had received referring to the inadmissibility of the suppressed evidence) is nonetheless recklessness that is the functional equivalent of intentional misconduct that is prosecutorial overreaching meriting a double-jeopardy bar of re-trial. Commonwealth v. Kareem Johnson, 40 EAP 2018 (Pa. 2019) (currently pending in the Pennsylvania Supreme Court); Commonwealth v. Nelson Rivera, Jr. 79 MAP 2018 (Pa. 2019) (currently pending in the Pennsylvania Supreme Court); Commonwealth v. Cooper-Reid, 78 MAP 2018 (Pa. 2019) (currently pending in the Pennsylvania Supreme Court).

*Appellant's Statement of Errors Complained of on Appeal, 2/4/2020.*

### Discussion

The Double Jeopardy Clause (DJC) of the Fifth Amendment to the United States Constitution prohibits prosecuting a defendant more than once for the same offense for which he has already received an acquittal or conviction. U.S. Const. Amend. 5; Pa. Const. Art. I, § 10. The DJC prohibits multiple punishments for the same offense. *Id.* Nevertheless, in cases involving prosecutorial misconduct, the double jeopardy clause "is *no bar to retrial* when the defendant moves for a mistrial." (emphasis added) *Oregon v. Kennedy*, 456 U.S. 667, 673 (1982).

However, there are two long-standing exceptions to the general rule that the Double Jeopardy Clause does not bar retrial. The first exception is the federal standard and bars retrial when the prosecutor has *goaded* or *provoked* the defendant into successfully moving for mistrial.[13] *Kennedy*, 456 U.S. at 679. Pennsylvania Courts have long adhered to the *Kennedy*

---

[13] "[A] defendant may invoke the bar of double jeopardy in a second effort to try him are limited to those cases in which the conduct giving rise to the successful motion for a mistrial was intended to provoke the defendant into moving for a mistrial. *Oregon v. Kennedy*, 456 U.S. 667, 679 (1982)

- 15 -

exception and finding that "the Commonwealth did not go to any length at all in an effort to hide, disguise, or lie about the fact that a bargain existed, and that alone extinguishes any claim that the prosecutor *intended to provoke a mistrial*").

However, Pennsylvania Courts have held that *Kennedy, supra,* represents the "constitutional floor" as it relates to barring a retrial on double jeopardy grounded in prosecutorial misconduct. *Commonwealth v. Edmunds,* 586 A.2d 887, 894 (1991). Therefore, in seeking to address continuing concerns over prosecutorial misconduct, our Supreme Court in *Smith,* 615 A.2d 321, expanded the protections afforded by our federal constitution. This "second exception" to the general rule that the Double Jeopardy Clause does not bar retrial is unique to Pennsylvania and holds that retrial is barred where "the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." *Commonwealth v. Smith,* 615 A.2d 321, 325 (Pa. 1992).[14]

Specifically, our Supreme Court in *Smith,* statedt:

> **[T]he double jeopardy clause of the Pennsylvania Constitution prohibits retrial of a defendant not only when prosecutorial misconduct is intended to provoke the defendant into moving for a mistrial, *but also* when the conduct of the prosecutor is intentionally undertaken to prejudice the defendant to the point of the denial of a *fair trial.*

*Smith,* 615 A.2d at 325. (emphasis added).

In the aftermath of *Smith,* our courts have sought to determine what sort of prosecutorial misconduct rises to the level of having been "intentionally undertaken to prejudice the defendant to the point of the denial of a fair trial." In *Commonwealth v. Martorano,* 741 A.2d 1221, 559

---

[14] As of May 2020, the Supreme Court of Pennsylvania has implemented a third exception which expands upon the *Smith* standard. *See infra* pp. 7-9.

Pa. 533 (Pa. 1999), cited by appellant, our Supreme Court in finding that prosecutorial misconduct barred retrial found that the prosecutor:

> [A]cted in bad faith throughout the trial, consistently making reference to evidence that the trial court had ruled inadmissible, continually defying the trial court's rulings on objections, and, in a tactic that can only be described as Machiavellian, repeatedly insisting that there was fingerprint evidence linking [defendant] to the crime when the prosecutor knew for a fact no such evidence existed.

*Commonwealth v. Martorano*, 741 A.2d 1221, 1223 (Pa. 1999)

While prosecutorial intent is essential to raising the double jeopardy bar to retrial under the *Smith* standard, the standard did not create a *per se* bar to retrial for every case of intentional prosecutorial misconduct but only those that "so prejudice the defendant as to deny him a fair trial." *Commonwealth v. Kearns*, 70 A.3d at 885 (Pa. Super 2013).

In *Kearns*, the Court made it clear that "gross negligence on the part of the Commonwealth is never a sufficient basis upon which to bar retrial on double jeopardy grounds." *Kearns*, at 886 (internal citation omitted). As the Court noted, "most forms of undue prejudice caused by inadvertent prosecutorial error or misconduct can be remedied in individual cases by retrial." *Id.* at 885. *See also Commonwealth v. Hawkins*, 701 A.2d 492, 501 (1997) (holding that "in order to raise double jeopardy implications, the prosecutor's misconduct must have been deliberate, undertaken in bad faith and with a *specific intent* to deny the defendant of a fair trial") (emphasis added). However, where a prosecutor has engaged in misconduct with the specific intent and design to demean or subvert the truth-seeking process, they have "raise[d] systematic concerns beyond a specific individual's right to a fair trial that are left unaddressed by retrial." *Kearns*, 70 A.3d at 885. Thus, the intent to deprive a defendant of his right to a fair trial is found in cases which deal with extreme prosecutorial misconduct.

*Johnson* cited the following mistakes of the prosecution in justifying the expansion of the *Smith* exception:

> "In terms of the errors made by the attorney himself, *first*, there was a notable discrepancy between the property receipt numbers for the two caps. The prosecutor was aware this meant that the associated results reflecting the presence of the victim's blood and Appellant's DNA might have related to different pieces of physical evidence. Yet, in the face of this information, he never sought to verify his working hypothesis that the receipt numbers pertained the same baseball cap. He did not even notice this error at the preliminary hearing when he had in his possession property receipt number 2425291, which clearly stated that it was associated with a black baseball cap. *Second*, in preparation for a capital case, the prosecutor did not obtain a criminalistics report which would have summarized the evidence connected with the matter and revealed that there were two different caps involved."

*Johnson*, 231 A.3d at 15. (emphasis added).

The Court emphasizes the way in which the errors of the prosecution "dovetailed" with the errors of law enforcement to utterly deny the defendant his right to a fair trial:

> "[T]here are two particularly noteworthy examples. *First*, on the night of the shooting, the assigned detective interviewed the victim's companion, Ms. Williams, who personally handed him a black baseball cap with a bullet hole in it, and explained that it was the hat the victim was wearing when he was shot. This crucial piece of information was apparently forgotten as the investigation ensued. *Second*, the lead crime scene investigator testified that, when he went to the location of the murder, he saw fresh drops of blood under the brim of the red cap, when that would have been impossible – as persuasively explained by the common pleas court. *Additionally*, the fact that no photographs of the underside of the brim were part of the crime scene record appears not to have been viewed as problematic by anyone associated with the prosecution. We, like the common pleas court, cannot escape the conclusion that the officer testified to something that he did not actually observe, especially in light of his subsequent explanation that the testimony was wrong and was based on a mere assumption."

*Johnson*, 231 A.3d at 15. (emphasis added).

To determine whether there is prosecutorial misconduct "undertaken recklessly, that is, with a conscious disregard for a substantial risk" that it will deny the defendant his right to a fair trial so as to bar a defendant's retrial under the *Smith* exception, our Supreme Court in *Johnson*

emphasizes a totality of the circumstance approach to determining whether reckless prosecutorial misconduct has effectively denied the defendant his right to a fair trial.

In light of our Supreme Court's holding in *Johnson*, our Superior Court recently undertook review on remand from our Supreme Court the co-defendant cases of *Commonwealth v. Rivera and Commonwealth v. Cooper Reid, 792 MDA 2017, 793 MDA 2017*. In *Commonwealth v. Rivera and Commonwealth v. Cooper Reid* our Superior Court reviewed the errors committed by the Commonwealth in the case.

First, the Commonwealth attempted to qualify a lead investigator who had posed as a heroin user in the case, as an expert in voice recognition without disclosing its intent prior to trial. The trial court denied this request. Second, the Commonwealth introduced a PowerPoint presentation to the jury without first informing the defendant that a corrected slide had been substituted for an incorrect slide. The lead investigator stated that this was because the PowerPoint presentation was a work in progress at the time of trial. The PowerPoint presentation contained aerial views where the drug buys occurred which were not disclosed to the defendants previously because as the prosecutor advised the trial court that they had not been supplied because they were readily available. Fourth, the Commonwealth destroyed a cell phone that contained text messages between an investigator and defendant, Rivera. The investigator took photographs of the text screens with defendant Rivera prior to destroying the phone. The investigator advised the trial court that he did so to protect other confidential information that was also contained in the cell phone from other cases. The trial court permitted the Commonwealth to introduce the photographs of the text messages at trial. Finally, the Commonwealth failed to disclose prior to trial defendant's inculpatory statement made to an investigator about a drug sale. The statement was likewise not contained in the investigator's

report. The investigator stated at a post-trial hearing that he did not intentionally fail to mention the inculpatory conversation in his report.

In denying the defendants request to bar retrial based upon prosecutorial misconduct, the court in *Commonwealth v. Rivera and Commonwealth v. Cooper Reid*, with the backdrop of *Johnson*, supra, stated that the "trial court presides as the factfinder when the defendant moves for retrial on the basis of prosecutorial misconduct, and we cannot disturb findings that are supported by the record." *Commonwealth v. Graham*, 109 A.3d 733, 736 (Pa. Super. 2015). Our Superior Court found that the "record supports' the finding of the trial court which found that the "Commonwealth's errors were negligent, *not reckless or intentional." Id.*

Applying the legal principles set forth by our United States Supreme Court in *Kennedy*, and our courts in *Smith, Mortorano, Kearns, Graham*, and now most recently in *Johnson* and *Rivera and Cooper Reid*, this Court, like our Superior Court *Rivera and Cooper Reid*, finds no resemblance between this case and that described by our Supreme Court in *Johnson, supra.* In *Johnson*, the Commonwealth, proceeded to trial with nothing to identify the defendant to the case other than a baseball cap with his DNA. Yet there, the Commonwealth and their police witnesses ignored the other cap worn by the victim which contain a bullet hole and the victim's blood and instead chose to "almost unimaginably" place the victim's blood on the defendant's cap, thus identifying him as the victim's killer. This conflagration of irreconcilable errors were made by both the prosecutor and investigator's testifying on behalf of the Commonwealth, despite all of them having the knowledge that there were two (2) property receipts, one for each cap.

In the instant matter, as previously set forth *supra*, this Court found that an experienced prosecutor made a mistake. He picked up the wrong gun. As this court stated on the record both

immediately after it occurred and following a post-trial hearing on appellant's motion to bar retrial, this mistake could have been prevented, but that does not make it reckless or intentional or an attempt to deny appellant a fair trial. There was no overreaching. There was no recklessness. There was no attempt to disadvantage the appellant or compel him to seek a mistrial. Unlike in *Johnson*, here there were numerous witnesses to the shooting of Officer Davies. His identification was not in doubt, only his intent. There was no need for over-reaching and no attempt to do so.

As our Superior Court stated in *Rivera and Cooper-Reid,* "The Commonwealth's errors in this case were negligent rather than reckless or intentional. Thus, *Kearns* governs this case instead of *Smith* or *Johnson-* and under *Kearns*, the proper remedy for the Commonwealth's negligence was not to bar retrial but to order a new trial. The trial court properly denied appellant's claim of double jeopardy" *Rivera and Cooper-Reid,* 2020 WL 6042041, p. 6.

For all the above reasons, this Court properly denied appellant's request to bar prosecution on the grounds of double jeopardy.

## CONCLUSION

In summary, this Court finds no harmful, prejudicial, or reversible error and nothing to justify the granting of Appellant's request for relief. For the reasons set forth above, the judgment of the trial court should be affirmed.

5/24/21
Date

HONORABLE CHARLES A. EHRLICH

- 22 -